# FRANK LYON CO. *v.* UNITED STATES

No. 76–624. Argued November 2, 1977—Decided April 18, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting statement, *post*, p. 584. STEVENS, J., filed a dissenting opinion, *post*, p. 584.

*Erwin N. Griswold* argued the cause for petitioner. With him on the briefs was *J. Gaston Williamson.*

*Stuart A. Smith* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Ferguson,* and *John A. Dudeck, Jr.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the federal income tax consequences of a sale-and-leaseback in which petitioner Frank Lyon Company (Lyon) took title to a building under construction by Worthen Bank & Trust Company (Worthen) of Little Rock, Ark., and simultaneously leased the building back to Worthen for long-term use as its headquarters and principal banking facility.

---

*George G. Gallantz* filed a brief for the National Realty Committee as *amicus curiae* urging reversal.

## I

The underlying pertinent facts are undisputed. They are established by stipulations, App. 9, 14, the trial testimony, and the documentary evidence, and are reflected in the District Court's findings.

## A

Lyon is a closely held Arkansas corporation engaged in the distribution of home furnishings, primarily Whirlpool and RCA electrical products. Worthen in 1965 was an Arkansas-chartered bank and a member of the Federal Reserve System. Frank Lyon was Lyon's majority shareholder and board chairman; he also served on Worthen's board. Worthen at that time began to plan the construction of a multistory bank and office building to replace its existing facility in Little Rock. About the same time Worthen's competitor, Union National Bank of Little Rock, also began to plan a new bank and office building. Adjacent sites on Capitol Avenue, separated only by Spring Street, were acquired by the two banks. It became a matter of competition, for both banking business and tenants, and prestige as to which bank would start and complete its building first.

Worthen initially hoped to finance, to build, and to own the proposed facility at a total cost of $9 million for the site, building, and adjoining parking deck. This was to be accomplished by selling $4 million in debentures and using the proceeds in the acquisition of the capital stock of a wholly owned real estate subsidiary. This subsidiary would have formal title and would raise the remaining $5 million by a conventional mortgage loan on the new premises. Worthen's plan, however, had to be abandoned for two significant reasons:

1. As a bank chartered under Arkansas law, Worthen legally could not pay more interest on any debentures it might issue than that then specified by Arkansas law. But the proposed obligations would not be marketable at that rate.

2. Applicable statutes or regulations of the Arkansas State Bank Department and the Federal Reserve System required Worthen, as a state bank subject to their supervision, to obtain prior permission for the investment in banking premises of any amount (including that placed in a real estate subsidiary) in excess of the bank's capital stock or of 40% of its capital stock and surplus.[1]  See Ark. Stat. Ann. § 67–547.1 (Supp. 1977); 12 U. S. C. § 371d (1976 ed.); 12 CFR § 265.2 (f)(7) (1977). Worthen, accordingly, was advised by staff employees of the Federal Reserve System that they would not recommend approval of the plan by the System's Board of Governors.

Worthen therefore was forced to seek an alternative solution that would provide it with the use of the building, satisfy the state and federal regulators, and attract the necessary capital. In September 1967 it proposed a sale-and-leaseback arrangement.  The State Bank Department and the Federal Reserve System approved this approach, but the Department required that Worthen possess an option to purchase the leased property at the end of the 15th year of the lease at a set price, and the federal regulator required that the building be owned by an independent third party.

Detailed negotiations ensued with investors that had indicated interest, namely, Goldman, Sachs & Company; White, Weld & Co.; Eastman Dillon, Union Securities & Company; and Stephens, Inc.  Certain of these firms made specific proposals.

Worthen then obtained a commitment from New York Life Insurance Company to provide $7,140,000 in permanent mortgage financing on the building, conditioned upon its approval of the titleholder.  At this point Lyon entered the negotiations and it, too, made a proposal.

---

[1] Worthen, as of June 30, 1967, had capital stock of $4 million and surplus of $5 million.  During the period the building was under construction Worthen became a national bank subject to the supervision and control of the Comptroller of the Currency.

Worthen submitted a counterproposal that incorporated the best features, from its point of view, of the several offers. Lyon accepted the counterproposal, suggesting, by way of further inducement, a $21,000 reduction in the annual rent for the first five years of the building lease. Worthen selected Lyon as the investor. After further negotiations, resulting in the elimination of that rent reduction (offset, however, by higher interest Lyon was to pay Worthen on a subsequent unrelated loan), Lyon in November 1967 was approved as an acceptable borrower by First National City Bank for the construction financing, and by New York Life, as the permanent lender. In April 1968 the approvals of the state and federal regulators were received.

In the meantime, on September 15, before Lyon was selected, Worthen itself began construction.

## B

In May 1968 Worthen, Lyon, City Bank, and New York Life executed complementary and interlocking agreements under which the building was sold by Worthen to Lyon as it was constructed, and Worthen leased the completed building back from Lyon.

1. Agreements between Worthen and Lyon. Worthen and Lyon executed a ground lease, a sales agreement, and a building lease.

Under the ground lease dated May 1, 1968, App. 366, Worthen leased the site to Lyon for 76 years and 7 months through November 30, 2044. The first 19 months were the estimated construction period. The ground rents payable by Lyon to Worthen were $50 for the first 26 years and 7 months and thereafter in quarterly payments:

12/1/94 through 11/30/99 (5 years)—$100,000 annually
12/1/99 through 11/30/04 (5 years)—$150,000 annually
12/1/04 through 11/30/09 (5 years)—$200,000 annually
12/1/09 through 11/30/34 (25 years)—$250,000 annually
12/1/34 through 11/30/44 (10 years)—$10,000 annually.

Under the sales agreement dated May 19, 1968, *id.*, at 508, Worthen agreed to sell the building to Lyon, and Lyon agreed to buy it, piece by piece as it was constructed, for a total price not to exceed $7,640,000, in reimbursements to Worthen for its expenditures for the construction of the building.[2]

Under the building lease dated May 1, 1968, *id.*, at 376, Lyon leased the building back to Worthen for a primary term of 25 years from December 1, 1969, with options in Worthen to extend the lease for eight additional 5-year terms, a total of 65 years. During the period between the expiration of the building lease (at the latest, November 30, 2034, if fully extended) and the end of the ground lease on November 30, 2044, full ownership, use, and control of the building were Lyon's, unless, of course, the building had been repurchased by Worthen. *Id.*, at 369. Worthen was not obligated to pay rent under the building lease until completion of the building. For the first 11 years of the lease, that is, until November 30, 1980, the stated quarterly rent was $145,581.03 ($582,324.12 for the year). For the next 14 years, the quarterly rent was $153,289.32 ($613,157.28 for the year), and for the option periods the rent was $300,000 a year, payable quarterly. *Id.*, at 378–379. The total rent for the building over the 25-year primary term of the lease thus was $14,989,767.24. That rent equaled the principal and interest payments that would amortize the $7,140,000 New York Life mortgage loan over the same period. When the mortgage was paid off at the end of the primary term, the annual building rent, if Worthen extended the lease, came down to the stated $300,000. Lyon's

---

[2] This arrangement appeared advisable and was made because purchases of materials by Worthen (which then had become a national bank) were not subject to Arkansas sales tax. See Ark. Stat. Ann. § 84–1904 (*l*) (1960); *First Agricultural Nat. Bank* v. *Tax Comm'n,* 392 U. S. 339 (1968). Sales of the building elements to Lyon also were not subject to state sales tax, since they were sales of real estate. See Ark. Stat. Ann. § 84–1902 (c) (Supp. 1977).

net rentals from the building would be further reduced by the increase in ground rent Worthen would receive from Lyon during the extension.[3]

The building lease was a "net lease," under which Worthen was responsible for all expenses usually associated with the maintenance of an office building, including repairs, taxes, utility charges, and insurance, and was to keep the premises in good condition, excluding, however, reasonable wear and tear.

Finally, under the lease, Worthen had the option to repurchase the building at the following times and prices:

11/30/80 (after 11 years)—$6,325,169.85
11/30/84 (after 15 years)—$5,432,607.32
11/30/89 (after 20 years)—$4,187,328.04
11/30/94 (after 25 years)—$2,145,935.00

These repurchase option prices were the sum of the unpaid balance of the New York Life mortgage, Lyon's $500,000 investment, and 6% interest compounded on that investment.

2. Construction financing agreement. By agreement dated May 14, 1968, id., at 462, City Bank agreed to lend Lyon $7,000,000 for the construction of the building. This loan was secured by a mortgage on the building and the parking deck, executed by Worthen as well as by Lyon, and an assignment by Lyon of its interests in the building lease and in the ground lease.

3. Permanent financing agreement. By Note Purchase

---

[3] This, of course, is on the assumption that Worthen exercises its option to extend the building lease. If it does not, Lyon remains liable for the substantial rents prescribed by the ground lease. This possibility brings into sharp focus the fact that Lyon, in a very practical sense, is at least the ultimate owner of the building. If Worthen does not extend, the building lease expires and Lyon may do with the building as it chooses.

The Government would point out, however, that the net amounts payable by Worthen to Lyon during the building lease's extended terms, if all are claimed, would approximate the amount required to repay Lyon's $500,000 investment at 6% compound interest. Brief for United States 14.

Agreement dated May 1, 1968, *id.,* at 443, New York Life agreed to purchase Lyon's $7,140,000 6¾% 25-year secured note to be issued upon completion of the building.   Under this agreement Lyon warranted that it would lease the building to Worthen for a noncancelable term of at least 25 years under a net lease at a rent at least equal to the mortgage payments on the note.   Lyon agreed to make quarterly payments of principal and interest equal to the rentals payable by Worthen during the corresponding primary term of the lease.   *Id.,* at 523.   The security for the note was a first deed of trust and Lyon's assignment of its interests in the building lease and in the ground lease.   *Id.,* at 527, 571.   Worthen joined in the deed of trust as the owner of the fee and the parking deck.

In December 1969 the building was completed and Worthen took possession.   At that time Lyon received the permanent loan from New York Life, and it discharged the interim loan from City Bank.   The actual cost of constructing the office building and parking complex (excluding the cost of the land) exceeded $10,000,000.

## C

Lyon filed its federal income tax returns on the accrual and calendar year basis.   On its 1969 return, Lyon accrued rent from Worthen for December.   It asserted as deductions one month's interest to New York Life; one month's depreciation on the building; interest on the construction loan from City Bank; and sums for legal and other expenses incurred in connection with the transaction.

On audit of Lyon's 1969 return, the Commissioner of Internal Revenue determined that Lyon was "not the owner for tax purposes of any portion of the Worthen Building," and ruled that "the income and expenses related to this building are not allowable . . . for Federal income tax purposes."   App. 304–305, 299.   He also added $2,298.15 to Lyon's 1969 income as "accrued interest income."   This was the computed 1969 portion of a gain, considered the equivalent of interest income,

the realization of which was based on the assumption that Worthen would exercise its option to buy the building after 11 years, on November 30, 1980, at the price stated in the lease, and on the additional determination that Lyon had "loaned" $500,000 to Worthen. In other words, the Commissioner determined that the sale-and-leaseback arrangement was a financing transaction in which Lyon loaned Worthen $500,000 and acted as a conduit for the transmission of principal and interest from Worthen to New York Life.

All this resulted in a total increase of $497,219.18 over Lyon's reported income for 1969, and a deficiency in Lyon's federal income tax for that year in the amount of $236,596.36. The Commissioner assessed that amount, together with interest of $43,790.84, for a total of $280,387.20.[4]

Lyon paid the assessment and filed a timely claim for its refund. The claim was denied, and this suit, to recover the amount so paid, was instituted in the United States District Court for the Eastern District of Arkansas within the time allowed by 26 U. S. C. § 6532 (a)(1).

After trial without a jury, the District Court, in a memorandum letter-opinion setting forth findings and conclusions, ruled in Lyon's favor and held that its claimed deductions were allowable. 75–2 USTC ¶ 9545 (1975), 36 AFTR 2d ¶ 75–5059 (1975); App. 296–311. It concluded that the legal intent of the parties had been to create a bona fide sale-and-leaseback in accordance with the form and language of the documents evidencing the transactions. It rejected the argument that Worthen was acquiring an equity in the building through its rental payments. It found that the rents were unchallenged and were reasonable throughout the period of the lease, and that the option prices, negotiated at arm's length between the parties, represented fair estimates of market value on the applicable dates. It rejected any negative

---

[4] These figures do not include uncontested adjustments not involved in this litigation.

inference from the fact that the rentals, combined with the options, were sufficient to amortize the New York Life loan and to pay Lyon a 6% return on its equity investment. It found that Worthen would acquire an equity in the building only if it exercised one of its options to purchase, and that it was highly unlikely, as a practical matter, that any purchase option would ever be exercised. It rejected any inference to be drawn from the fact that the lease was a "net lease." It found that Lyon had mixed motivations for entering into the transaction, including the need to diversify as well as the desire to have the benefits of a "tax shelter." App. 296, 299.

The United States Court of Appeals for the Eighth Circuit reversed. 536 F. 2d 746 (1976). It held that the Commissioner correctly determined that Lyon was not the true owner of the building and therefore was not entitled to the claimed deductions. It likened ownership for tax purposes to a "bundle of sticks" and undertook its own evaluation of the facts. It concluded, in agreement with the Government's contention, that Lyon "totes an empty bundle" of ownership sticks. *Id.*, at 751. It stressed the following: (a) The lease agreements circumscribed Lyon's right to profit from its investment in the building by giving Worthen the option to purchase for an amount equal to Lyon's $500,000 equity plus 6% compound interest and the assumption of the unpaid balance of the New York Life mortgage.[5] (b) The option prices did not take into account possible appreciation of the value of the building or inflation.[6] (c) Any award realized as a

---

[5] Lyon here challenges this assertion on the grounds that it had the right and opportunities to sell the building at a greater profit at any time; the return to Lyon was not insubstantial and was attractive to a true investor in real estate; the 6% return was the minimum Lyon would realize if Worthen exercised one of its options, an event the District Court found highly unlikely; and Lyon would own the building and realize a greater return than 6% if Worthen did not exercise an option to purchase.

[6] Lyon challenges this observation by pointing out that the District

result of destruction or condemnation of the building in excess of the mortgage balance and the $500,000 would be paid to Worthen and not Lyon.[7] (d) The building rental payments during the primary term were exactly equal to the mortgage payments.[8] (e) Worthen retained control over the ultimate disposition of the building through its various options to repurchase and to renew the lease plus its ownership of the site.[9] (f) Worthen enjoyed all benefits and bore all burdens incident to the operation and ownership of the building so that, in the Court of Appeals' view, the only economic advantages accruing to Lyon, in the event it were considered to be the true owner of the property, were income tax savings of approximately $1.5 million during the first 11

---

Court found the option prices to be the negotiated estimate of the parties of the fair market value of the building on the option dates and to be reasonable. App. 303, 299.

[7] Lyon asserts that this statement is true only with respect to the total destruction or taking of the building on or after December 1, 1980. Lyon asserts that it, not Worthen, would receive the excess above the mortgage balance in the event of total destruction or taking before December 1, 1980, or in the event of partial damage or taking at any time. *Id.,* at 408–410, 411.

[8] Lyon concedes the accuracy of this statement, but asserts that it does not justify the conclusion that Lyon served merely as a conduit by which mortgage payments would be transmitted to New York Life. It asserts that Lyon was the sole obligor on the New York Life note and would remain liable in the event of default by Worthen. It also asserts that the fact the rent was sufficient to amortize the loan during the primary term of the lease was a requirement imposed by New York Life, and is a usual requirement in most long-term loans secured by a long-term lease.

[9] As to this statement, Lyon asserts that the Court of Appeals ignored Lyon's right to sell the building to another at any time; the District Court's finding that the options to purchase were not likely to be exercised; the uncertainty that Worthen would renew the lease for 40 years; Lyon's right to lease to anyone at any price during the last 10 years of the ground lease; and Lyon's continuing ownership of the building after the expiration of the ground lease.

years of the arrangement.[10]  *Id.*, at 752–753.[11]  The court concluded, *id.*, at 753, that the transaction was "closely akin" to that in *Helvering* v. *Lazarus & Co.*, 308 U. S. 252 (1939). "In sum, the benefits, risks, and burdens which [Lyon] has incurred with respect to the Worthen building are simply too insubstantial to establish a claim to the status of owner for tax purposes. . . .  The vice of the present lease is that all of [its] features have been employed in the same transaction with the cumulative effect of depriving [Lyon] of any significant ownership interest."  536 F. 2d, at 754.

We granted certiorari, 429 U. S. 1089 (1977), because of an indicated conflict with *American Realty Trust* v. *United States*, 498 F. 2d 1194 (CA4 1974).

## II

This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid."  *Corliss* v. *Bowers*, 281 U. S. 376, 378 (1930).  In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control

---

[10] In response to this, Lyon asserts that the District Court found that the benefits of occupancy Worthen will enjoy are common in most long-term real estate leases, and that the District Court found that Lyon had motives other than tax savings in entering into the transaction.  It also asserts that the net cash after-tax benefit would be $312,220, not $1.5 million.

[11] Other factors relied on by the Court of Appeals, 536 F. 2d, at 752, were the allocation of the investment credit to Worthen, and a claim that Lyon's ability to sell the building to a third party was "carefully circumscribed" by the lease agreements.  The investment credit by statute is freely allocable between the parties, § 48 (d) of the 1954 Code, 26 U. S. C. § 48 (d), and the Government has not pressed either of these factors before this Court.

over the property transferred. *E. g., Commissioner* v. *Sunnen,* 333 U. S. 591 (1948); *Helvering* v. *Clifford,* 309 U. S. 331 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," *Commissioner* v. *Tower,* 327 U. S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering* v. *Lazarus & Co.,* 308 U. S., at 255. See also *Commissioner* v. *P. G. Lake, Inc.,* 356 U. S. 260, 266–267 (1958); *Commissioner* v. *Court Holding Co.,* 324 U. S. 331, 334 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner* v. *Duberstein,* 363 U. S. 278, 286 (1960).

In the light of these general and established principles, the Government takes the position that the Worthen-Lyon transaction in its entirety should be regarded as a sham. The agreement as a whole, it is said, was only an elaborate financing scheme designed to provide economic benefits to Worthen and a guaranteed return to Lyon. The latter was but a conduit used to forward the mortgage payments, made under the guise of rent paid by Worthen to Lyon, on to New York Life as mortgagee. This, the Government claims, is the true substance of the transaction as viewed under the microscope of the tax laws. Although the arrangement was cast in sale-and-leaseback form, in substance it was only a financing transaction, and the terms of the repurchase options and lease renewals so indicate. It is said that Worthen could reacquire the building simply by satisfying the mortgage debt and paying Lyon its $500,000 advance plus interest, regardless of the fair market value of the building at the time; similarly, when the mortgage was paid off, Worthen could extend the lease at

drastically reduced bargain rentals that likewise bore no relation to fair rental value but were simply calculated to pay Lyon its $500,000 plus interest over the extended term. Lyon's return on the arrangement in no event could exceed 6% compound interest (although the Government conceded it might well be less, Tr. of Oral Arg. 32). Furthermore, the favorable option and lease renewal terms made it highly unlikely that Worthen would abandon the building after it in effect had "paid off" the mortgage. The Government implies that the arrangement was one of convenience which, if accepted on its face, would enable Worthen to deduct its payments to Lyon as rent and would allow Lyon to claim a deduction for depreciation, based on the cost of construction ultimately borne by Worthen, which Lyon could offset against other income, and to deduct mortgage interest that roughly would offset the inclusion of Worthen's rental payments in Lyon's income. If, however, the Government argues, the arrangement was only a financing transaction under which Worthen was the owner of the building, Worthen's payments would be deductible only to the extent that they represented mortgage interest, and Worthen would be entitled to claim depreciation; Lyon would not be entitled to deductions for either mortgage interest or depreciation and it would not have to include Worthen's "rent" payments in its income because its function with respect to those payments was that of a conduit between Worthen and New York Life.

The Government places great reliance on *Helvering* v. *Lazarus & Co., supra,* and claims it to be precedent that controls this case. The taxpayer there was a department store. The legal title of its three buildings was in a bank as trustee for land-trust certificate holders. When the transfer to the trustee was made, the trustee at the same time leased the buildings back to the taxpayer for 99 years, with option to renew and purchase. The Commissioner, in stark contrast to his posture in the present case, took the position that the

statutory right to depreciation followed legal title. The Board of Tax Appeals, however, concluded that the transaction between the taxpayer and the bank in reality was a mortgage loan and allowed the taxpayer depreciation on the buildings. This Court, as had the Court of Appeals, agreed with that conclusion and affirmed. It regarded the "rent" stipulated in the leaseback as a promise to pay interest on the loan, and a "depreciation fund" required by the lease as an amortization fund designed to pay off the loan in the stated period. Thus, said the Court, the Board justifiably concluded that the transaction, although in written form a transfer of ownership with a leaseback, was actually a loan secured by the property involved.

The *Lazarus* case, we feel, is to be distinguished from the present one and is not controlling here. Its transaction was one involving only two (and not multiple) parties, the taxpayer-department store and the trustee-bank. The Court looked closely at the substance of the agreement between those two parties and rightly concluded that depreciation was deductible by the taxpayer despite the nomenclature of the instrument of conveyance and the leaseback. See also *Sun Oil Co.* v. *Commissioner,* 562 F. 2d 258 (CA3 1977) (a two-party case with the added feature that the second party was a tax-exempt pension trust).

The present case, in contrast, involves three parties, Worthen, Lyon, and the finance agency. The usual simple two-party arrangement was legally unavailable to Worthen. Independent investors were interested in participating in the alternative available to Worthen, and Lyon itself (also independent from Worthen) won the privilege. Despite Frank Lyon's presence on Worthen's board of directors, the transaction, as it ultimately developed, was not a familial one arranged by Worthen, but one compelled by the realities of the restrictions imposed upon the bank. Had Lyon not appeared, another interested investor would have been selected.

The ultimate solution would have been essentially the same. Thus, the presence of the third party, in our view, significantly distinguishes this case from *Lazarus* and removes the latter as controlling authority.

## III

It is true, of course, that the transaction took shape according to Worthen's needs. As the Government points out, Worthen throughout the negotiations regarded the respective proposals of the independent investors in terms of its own cost of funds. *E. g.,* App. 355. It is also true that both Worthen and the prospective investors compared the various proposals in terms of the return anticipated on the investor's equity. But all this is natural for parties contemplating entering into a transaction of this kind. Worthen needed a building for its banking operations and other purposes and necessarily had to know what its cost would be. The investors were in business to employ their funds in the most remunerative way possible. And, as the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred. *Commissioner* v. *National Alfalfa Dehydrating & Milling Co.,* 417 U. S. 134, 148–149 (1974); *Central Tablet Mfg. Co.* v. *United States,* 417 U. S. 673, 690 (1974).

There is no simple device available to peel away the form of this transaction and to reveal its substance. The effects of the transaction on all the parties were obviously different from those that would have resulted had Worthen been able simply to make a mortgage agreement with New York Life and to receive a $500,000 loan from Lyon. Then *Lazarus* would apply. Here, however, and most significantly, it was Lyon alone, and not Worthen, who was liable on the notes, first to City Bank, and then to New York Life. Despite the facts that Worthen had agreed to pay rent and that this rent equaled the amounts due from Lyon to New York Life, should anything go awry in the later years of the lease, Lyon

was primarily liable.[12]   No matter how the transaction could have been devised otherwise, it remains a fact that as the agreements were placed in final form, the obligation on the notes fell squarely on Lyon.[13]   Lyon, an ongoing enterprise, exposed its very business well-being to this real and substantial risk.

The effect of this liability on Lyon is not just the abstract possibility that something will go wrong and that Worthen will not be able to make its payments.   Lyon has disclosed this liability on its balance sheet for all the world to see.   Its financial position was affected substantially by the presence of this long-term debt, despite the offsetting presence of the building as an asset.   To the extent that Lyon has used its capital in this transaction, it is less able to obtain financing for other business needs.

In concluding that there is this distinct element of economic reality in Lyon's assumption of liability, we are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same.   *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U. S. 345, 355 (1971); *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552, 562 (1932).   Accounting methods or descriptions, without more, do not lend substance to that which has no substance.   But in this case accepted accounting methods, as understood by the several parties to the respective agreements and as applied to the transaction by others, gave the transaction a meaningful character consonant with the form it was given.[14]   Worthen

---

[12] New York Life required Lyon, not Worthen, to submit financial statements periodically.   See Note Purchase Agreement, App. 453–454, 458–459.

[13] It may well be that the remedies available to New York Life against Lyon would be far greater than any remedy available to it against Worthen, which, as lessee, is liable to New York Life only through Lyon's assignment of its interest as lessor.

[14] We are aware that accounting standards have changed significantly since 1968 and that the propriety of Worthen's and Lyon's methods of

was not allowed to enter into the type of transaction which the Government now urges to be the true substance of the arrangement.    Lyon and Worthen cannot be said to have en-

---

disclosing the transaction in question may be a matter for debate under these new standards.   Compare Acccounting Principles Bd. Opinion No. 5, Reporting of Leases in Financial Statements of Lessee (1964), and Accounting Principles Bd. Opinion No. 7, Accounting for Leases in Financial Statements of Lessors (1966), with Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 13, Accounting for Leases (1976).   See also Comptroller of the Currency, Banking Circular No. 95 (Nov. 11, 1977), instructing that national banks revise their financial statements in accord with FASB Standard No. 13.   Standard No. 13, however, by its terms, states, ¶78, that there are many instances where tax and financial accounting treatments diverge.   Further, Standard No. 13 is nonapplicable with respect to a lease executed prior to January 1, 1977 (as was the Lyon-Worthen lease), until January 1, 1981.   Obviously, Banking Circular No. 95 was not in effect in 1968 when the Lyon-Worthen lease was executed.

Then-existing pronouncements of the Internal Revenue Service gave Lyon very little against which to measure the transaction.   The most complete statement on the general question of characterization of leases as sales, Rev. Rul. 55-540, 1955-2 Cum. Bull. 39, by its terms dealt only with equipment leases.   In that ruling it was stated that the Service will look at the intent of the parties at the time the agreement was executed to determine the proper characterization of the transaction.   Generally, an intent to enter into a conditional sales agreement will be found to be present if (a) portions of the rental payments are made specifically applicable to an equity acquired by the lessee, (b) the lessee will acquire a title automatically after certain payments have been made, (c) the rental payments are a disproportionately large amount in relation to the sum necessary to complete the sale, (d) the rental payments are above fair rental value, (e) title can be acquired at a nominal option price, or (f) some portion of the rental payments are identifiable as interest.   See also Rev. Rul. 60-122, 1960-1 Cum. Bull. 56; Rev. Rul. 72-543, 1972-2 Cum. Bull. 87.

The Service announced more specific guidelines, indicating under what circumstances it would answer requests for rulings on leverage leasing transactions, in Rev. Proc. 75-21, 1975-1 Cum. Bull. 715.   In general, "[u]nless other facts and circumstances indicate a contrary intent," the Service will not rule that a lessor in a leveraged lease transaction is to be treated as the owner of the property in question unless (a) the lessor has

tered into the transaction intending that the interests involved were allocated in a way other than that associated with a sale-and-leaseback.

Other factors also reveal that the transaction cannot be viewed as anything more than a mortgage agreement between Worthen and New York Life and a loan from Lyon to Worthen. There is no legal obligation between Lyon and Worthen representing the $500,000 "loan" extended under the Government's theory. And the assumed 6% return on this putative loan—required by the audit to be recognized in the taxable year in question—will be realized only when and if Worthen exercises its options.

The Court of Appeals acknowledged that the rents alone, due after the primary term of the lease and after the mortgage has been paid, do not provide the simple 6% return which, the Government urges, Lyon is guaranteed, 536 F. 2d, at 752. Thus, if Worthen chooses not to exercise its options, Lyon is gambling that the rental value of the building during the last 10 years of the ground lease, during which the ground rent is minimal, will be sufficient to recoup its investment before it must negotiate again with Worthen regarding the ground lease. There are simply too many contingencies, including variations in the value of real estate, in the cost of money, and in the capital structure of Worthen, to permit the conclusion that the parties intended to enter into the transaction as

---

incurred and maintains a minimal investment equal to 20% of the cost of the property, (b) the lessee has no right to purchase except at fair market value, (c) no part of the cost of the property is furnished by the lessee, (d) the lessee has not lent to the lessor or guaranteed any indebtedness of the lessor, and (e) the lessor must demonstrate that it expects to receive a profit on the transaction other than the benefits received solely from the tax treatment. These guidelines are not intended to be definitive, and it is not clear that they provide much guidance in assessing real estate transactions. See Rosenberg & Weinstein, Sale-leasebacks: An analysis of these transactions after the *Lyon* decision, 45 J. Tax. 146, 147 n. 1 (1976).

structured in the audit and according to which the Government now urges they be taxed.

It is not inappropriate to note that the Government is likely to lose little revenue, if any, as a result of the shape given the transaction by the parties. No deduction was created that is not either matched by an item of income or that would not have been available to one of the parties if the transaction had been arranged differently. While it is true that Worthen paid Lyon less to induce it to enter into the transaction because Lyon anticipated the benefit of the depreciation deductions it would have as the owner of the building, those deductions would have been equally available to Worthen had it retained title to the building. The Government so concedes. Tr. of Oral Arg. 22–23. The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences.[15] We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction. See *Commissioner* v. *Brown,* 380 U. S. 563, 579–580 (1965) (Harlan, J., concurring). Lyon is not a corporation with no purpose other than to hold title to the bank building. It was not created by Worthen or even financed to any degree by Worthen.

The conclusion that the transaction is not a simple sham to be ignored does not, of course, automatically compel the further conclusion that Lyon is entitled to the items claimed as deductions. Nevertheless, on the facts, this readily follows. As has been noted, the obligations on which Lyon paid interest

---

[15] Indeed, it is not inevitable that the transaction, as treated by Lyon and Worthen, will not result in more revenues to the Government rather than less. Lyon is gambling that in the first 11 years of the lease it will have income that will be sheltered by the depreciation deductions, and that it will be able to make sufficiently good use of the tax dollars preserved thereby to make up for the income it will recognize and pay taxes on during the last 14 years of the initial term of the lease and against which it will enjoy no sheltering deduction.

were its obligations alone, and it is entitled to claim deductions therefor under § 163 (a) of the 1954 Code, 26 U. S. C. § 163 (a).

As is clear from the facts, none of the parties to this sale-and-leaseback was the owner of the building in any simple sense. But it is equally clear that the facts focus upon Lyon as the one whose capital was committed to the building and as the party, therefore, that was entitled to claim depreciation for the consumption of that capital. The Government has based its contention that Worthen should be treated as the owner on the assumption that throughout the term of the lease Worthen was acquiring an equity in the property. In order to establish the presence of that growing equity, however, the Government is forced to speculate that one of the options will be exercised and that, if it is not, this is only because the rentals for the extended term are a bargain. We cannot indulge in such speculation in view of the District Court's clear finding to the contrary.[16] We therefore conclude that it is Lyon's capital that is invested in the building according to the agreement of the parties, and it is Lyon that is entitled to depreciation deductions, under § 167 of the 1954 Code, 26 U. S. C. § 167. Cf. *United States* v. *Chicago B. & Q. R. Co.*, 412 U. S. 401 (1973).

## IV

We recognize that the Government's position, and that taken by the Court of Appeals, is not without superficial appeal. One, indeed, may theorize that Frank Lyon's presence on the Worthen board of directors; Lyon's departure from its principal corporate activity into this unusual venture; the parallel between the payments under the building lease and the amounts due from Lyon on the New York Life mortgage; the provisions relating to condemnation or destruction of the

---

[16] The general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so subject. See *American Realty Trust* v. *United States*, 498 F. 2d 1194, 1198 (CA4 1974).

property; the nature and presence of the several options available to Worthen; and the tax benefits, such as the use of double declining balance depreciation, that accrue to Lyon during the initial years of the arrangement, form the basis of an argument that Worthen should be regarded as the owner of the building and as the recipient of nothing more from Lyon than a $500,000 loan.

We, however, as did the District Court, find this theorizing incompatible with the substance and economic realities of the transaction: the competitive situation as it existed between Worthen and Union National Bank in 1965 and the years immediately following; Worthen's undercapitalization; Worthen's consequent inability, as a matter of legal restraint, to carry its building plans into effect by a conventional mortgage and other borrowing; the additional barriers imposed by the state and federal regulators; the suggestion, forthcoming from the state regulator, that Worthen possess an option to purchase; the requirement, from the federal regulator, that the building be owned by an independent third party; the presence of several finance organizations seriously interested in participating in the transaction and in the resolution of Worthen's problem; the submission of formal proposals by several of those organizations; the bargaining process and period that ensued; the competitiveness of the bidding; the bona fide character of the negotiations; the three-party aspect of the transaction; Lyon's substantiality [17] and its independence from Worthen; the fact that diversification was Lyon's principal motivation; Lyon's being liable alone on the successive notes to City Bank and New York Life; the reasonableness, as the District Court found, of the rentals and of the option prices; the substantiality of the purchase prices;

---

[17] Lyon's consolidated balance sheet on December 31, 1968, showed assets of $12,225,612, and total stockholders' equity of $3,818,671  Of the assets, the sum of $2,674,290 represented its then investment in the Worthen building.  App. 587–588.

Lyon's not being engaged generally in the business of financing; the presence of all building depreciation risks on Lyon; the risk, borne by Lyon, that Worthen might default or fail, as other banks have failed; the facts that Worthen could "walk away" from the relationship at the end of the 25-year primary term, and probably would do so if the option price were more than the then-current worth of the building to Worthen; the inescapable fact that if the building lease were not extended, Lyon would be the full owner of the building, free to do with it as it chose; Lyon's liability for the substantial ground rent if Worthen decides not to exercise any of its options to extend; the absence of any understanding between Lyon and Worthen that Worthen would exercise any of the purchase options; the nonfamily and nonprivate nature of the entire transaction; and the absence of any differential in tax rates and of special tax circumstances for one of the parties—all convince us that Lyon has far the better of the case.[18]

In so concluding, we emphasize that we are not condoning manipulation by a taxpayer through arbitrary labels and dealings that have no economic significance. Such, however, has not happened in this case.

In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is

---

[18] Thus, the facts of this case stand in contrast to many others in which the form of the transaction actually created tax advantages that, for one reason or another, could not have been enjoyed had the transaction taken another form. See, *e. g., Sun Oil Co.* v. *Commissioner,* 562 F. 2d 258 (CA3 1977) (sale-and-leaseback of land between taxpayer and tax-exempt trust enabled the taxpayer to amortize, through its rental deductions, the cost of acquiring land not otherwise depreciable). Indeed, the arrangements in this case can hardly be labeled as tax-avoidance techniques in light of the other arrangments being promoted at the time. See, *e. g.,* Zeitlin, Tax Planning in Equipment-Leasing Shelters, 1969 So. Cal. Tax Inst. 621; Marcus, Real Estate Purchase-Leasebacks as Secured Loans, 2 Real Estate L. J. 664 (1974).

imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions.[19]

The judgment of the Court of Appeals, accordingly, is reversed.

*It is so ordered.*

MR. JUSTICE WHITE dissents and would affirm the judgment substantially for the reasons stated in the opinion in the Court of Appeals for the Eighth Circuit. 536 F. 2d 746 (1976).

MR. JUSTICE STEVENS, dissenting.

In my judgment the controlling issue in this case is the economic relationship between Worthen and petitioner, and matters such as the number of parties, their reasons for structuring the transaction in a particular way, and the tax benefits which may result, are largely irrelevant. The question whether a leasehold has been created should be answered by examining the character and value of the purported lessor's reversionary estate.

For a 25-year period Worthen has the power to acquire full ownership of the bank building by simply repaying the

---

[19] See generally *Commissioner* v. *Danielson*, 378 F. 2d 771 (CA3), cert. denied, 389 U. S. 858 (1967), on remand, 50 T. C. 782 (1968); *Levinson* v. *Commissioner*, 45 T. C. 380 (1966); *World Publishing Co.* v. *Commissioner*, 299 F. 2d 614 (CA8 1962); *Northwest Acceptance Corp.* v. *Commissioner*, 58 T. C. 836 (1972), aff'd, 500 F. 2d 1222 (CA9 1974); *Cubic Corp.* v. *United States*, 541 F. 2d 829 (CA9 1976).

amounts, plus interest, advanced by the New York Life Insurance Company and petitioner. During that period, the economic relationship among the parties parallels exactly the normal relationship between an owner and two lenders, one secured by a first mortgage and the other by a second mortgage.[1] If Worthen repays both loans, it will have unencumbered ownership of the property. What the character of this relationship suggests is confirmed by the economic value that the parties themselves have placed on the reversionary interest.

All rental payments made during the original 25-year term are credited against the option repurchase price, which is exactly equal to the unamortized cost of the financing. The value of the repurchase option is thus limited to the cost of the financing, and Worthen's power to exercise the option is cost free. Conversely, petitioner, the nominal owner of the reversionary estate, is not entitled to receive *any* value for the surrender of its supposed rights of ownership.[2] Nor does

---

[1] "[W]here a fixed price, as in *Frank Lyon Company*, is designed merely to provide the lessor with a predetermined fixed return, the substantive bargain is more akin to the relationship between a debtor and creditor than between a lessor and lessee." Rosenberg & Weinstein, Sale-leasebacks: An analysis of these transactions after the *Lyon* decision, 45 J. Tax. 146, 149 (1976).

[2] It is worth noting that the proposals submitted by two other potential investors in the building, see *ante*, at 564, did contemplate that Worthen would pay a price above the financing costs for acquisition of the leasehold interest. For instance, Goldman, Sachs & Company proposed that, at the end of the lease's primary term, Worthen would have the option to repurchase the property for either its fair market value or 20% of its original cost, whichever was the greater. See Brief for United States 8 n. 7. A repurchase option based on fair market value, since it acknowledges the lessor's equity interest in the property, is consistent with a lessor-lessee relationship. See *Breece Veneer & Panel Co.* v. *Commissioner*, 232 F. 2d 319 (CA7 1956); *LTV Corp.* v. *Commissioner*, 63 T. C. 39, 50 (1974); see generally Comment, Sale and Leaseback Transactions, 52 N. Y. U. L. Rev. 672, 688–689, n. 117 (1977).

it have any power to control Worthen's exercise of the option.[3]

"It is fundamental that 'depreciation is not predicated upon ownership of property *but rather upon an investment in property.*' No such investment exists when payments of the purchase price in accordance with the design of the parties yield no equity to the purchaser." *Estate of Franklin* v. *Commissioner,* 544 F. 2d 1045, 1049 (CA9 1976) (citations omitted; emphasis in original). Here, the petitioner has, in effect, been guaranteed that it will receive its original $500,000 plus accrued interest. But that is all. It incurs neither the risk of depreciation,[4] nor the benefit of possible appreciation. Under the terms of the sale-leaseback, it will stand in no better or worse position after the 11th year of the lease—when Worthen can first exercise its option to repurchase—whether the property has appreciated or depreciated.[5] And this remains true throughout the rest of the 25-year period.

---

[3] The situation in this case is thus analogous to that in *Corliss* v. *Bowers,* 281 U. S. 376, where the Court held that the grantor of a trust who retains an unrestricted cost-free power of revocation remains the owner of the trust assets for tax purposes. Worthen's power to exercise its repurchase option is similar; the only restraints upon it are those normally associated with the repayment of a loan, such as limitations on the timing of repayment and the amount due at the stated intervals.

[4] Petitioner argues that it bears the risk of depreciation during the primary term of the lease, because the option price decreases over time. Brief for Petitioner 29–30. This is clearly incorrect. Petitioner will receive $500,000 plus interest, and no more or less, whether the option is exercised as soon as possible or only at the end of 25 years. Worthen, on the other hand, does bear the risk of depreciation, since its opportunity to make a profit from the exercise of its repurchase option hinges on the value of the building at the time.

[5] After the 11th year of the lease, there are three ways that the lease might be terminated. The property might be condemned, the building might be destroyed by act of God, or Worthen might exercise its option to purchase. In any such event, if the property had increased in value, the entire benefit would be received by Worthen and petitioner would receive only its $500,000 plus interest. See Reply Brief for Petitioner 8–9, n. 2.

Petitioner has assumed only two significant risks. First, like any other lender, it assumed the risk of Worthen's insolvency. Second, it assumed the risk that Worthen might *not* exercise its option to purchase at or before the end of the original 25-year term.[6] If Worthen should exercise that right *not* to repay, perhaps it would *then* be appropriate to characterize petitioner as the owner and Worthen as the lessee. But speculation as to what might happen in 25 years cannot justify the *present* characterization of petitioner as the owner of the building. Until Worthen has made a commitment either to exercise or not to exercise its option,[7] I think the Government is correct in its view that petitioner is not the owner of the building for tax purposes. At present, since Worthen has

---

[6] The possibility that Worthen might not exercise its option is a risk for petitioner because in that event petitioner's advance would be amortized during the ensuing renewal lease terms, totaling 40 years. Yet there is a possibility that Worthen would choose not to renew for the full 40 years or that the burdens of owning a building and paying a ground rental of $10,000 during the years 2034 through 2044 would exceed the benefits of ownership. *Ante*, at 579.

[7] In this case, the lessee is not "economically compelled" to exercise its option. See *American Realty Trust* v. *United States*, 498 F. 2d 1194 (CA4 1974). Indeed, it may be more advantageous for Worthen to let its option lapse since the present value of the renewal leases is somewhat less than the price of the option to repurchase. See Brief for United States 40 n. 26. But whether or not Worthen is likely to exercise the option, as long as it retains its unrestricted cost-free power to do so, it must be considered the owner of the building. See *Sun Oil Co.* v. *Commissioner*, 562 F. 2d 258, 267 (CA3 1977) (repurchase option enabling lessee to acquire leased premises by repaying financing costs indicative of lessee's equity interest in those premises).

In effect, Worthen has an option to "put" the building to petitioner if it drops in value below $500,000 plus interest. Even if the "put" appears likely because of bargain lease rates after the primary terms, that would not justify the present characterization of petitioner as the owner of the building.

the unrestricted right to control the residual value of the property for a price which does not exceed the cost of its unamortized financing, I would hold, as a matter of law, that it is the owner.

I therefore respectfully dissent.