IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| PETER C. GREGG<br>and RENAE J. GREGG, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 140043C |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE,<br>State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision entered on

September 24, 2014. The court did not receive a request for an award of costs and disbursements

within 14 days after its Decision was entered. *See* TCR-MD 19.

Plaintiffs appeal Defendant's Notice of Deficiency Assessment (Assessment) dated

January 14, 2014, for the 2010 tax year. A trial was held in the Oregon Tax Courtroom on

August 20, 2014, in Salem, Oregon. Peter Gregg (Gregg) testified on behalf of Plaintiffs.

Genevieve Traub (Traub), Senior Tax Auditor, appeared on behalf of Defendant. Traub

presented Defendant's case through her own testimony and the testimony of Gregg. Plaintiffs'

Exhibits 1 through 8 were received without objection. Defendant's Exhibits A, C, D, and E were

received into evidence. The court overruled Gregg's objection to the admission of portions of

Defendant's Exhibit E.[1]

---

[1] The appeal involves depreciation for solar thermal lenses that are allegedly in Utah; the manufacturer/seller is in Utah. The portions of Defendant's Exhibit E referenced by Defendant during trial concerned the lack of a local conditional land use permit and other required permits, licenses, and insurance for the manufacturing of thermal solar lenses, stainless steel turbines, heat exchangers, and circuit boards in 2011 (and before), and the eventual approval of a conditional use permit by Millard County (Utah) in April 2014. Gregg's objection was based on Plaintiffs' Exhibit 6, which is a letter signed by the three Millard County Commissioners dated February 12, 2014, expressing enthusiasm for the solar lens project in Millard County, Utah. Plaintiffs' Exhibit 6 does not conflict with Defendant's Exhibit E, and the court therefore admitted Exhibit E over Gregg's objection.

## I. STATEMENT OF FACTS

A.    *Plaintiffs' 2010 federal and state tax returns*

Plaintiffs filed joint 2010 income tax returns (federal and state).  (Def's Ex A.)  Plaintiffs' income was predominantly W-2 wage income from various employers.  (*Id*. at 5-9.)  Gregg reported nominal additional self-employment income ($1,875) from a landscaping business he operated in 2010.  (*Id*. at 11.)  Plaintiffs also reported Schedule C losses from a solar energy system venture[2] Gregg was involved with in 2010, as explained below.  Plaintiffs reported no income (gross receipts or sales) on that Schedule C.  (*Id.* at 13.)  The parties' dispute involves the depreciation from the solar energy system venture.

B.    *Plaintiffs' solar energy system depreciation*

Plaintiffs attached to their federal tax return a federal Schedule C, Profit or Loss From Business, related to an enterprise in which Gregg was involved.  (*Id.*)  That form reported a net loss of $21,960, all of which stems from depreciation Plaintiffs claimed in connection with solar lenses designed to create renewable power or heat.  (*Id.*)  There was no reported income (gross receipts or sales) on that 2010 Schedule C associated with that venture.  The disputed Schedule C names Gregg as the proprietor of a "business or profession, including product or service" that is identified on Plaintiffs' Schedule C as "Solar Energy System."[3]  No business name is reported in section C of that Schedule C.[4]  Defendant disallowed the entire deduction.  (Def's Ans at 1.)

/ / /

---

[2] The court has some difficulty in characterizing Gregg's activity or involvement in the solar energy system Gregg purports to have been involved in because the testimony and documentary evidence suggest either a purchase or an investment, and the evidence of either is "weak" overall.

[3] The language set out in quotes is the Internal Revenue Service's printed material appearing on the Schedule C.

[4] Plaintiffs filed at least one other federal form Schedule C for Gregg's landscaping business.  (Def's Ex A at 11-12.)

When questioned about his calculation of depreciation, Gregg testified that he was not sure how he calculated the $21,960 depreciation he reported in 2010 for the lenses purchased that year. Gregg testified that he prepared Plaintiffs' tax returns in 2010 using a commercially available computer software program and that, although he is not tax person, he read the "tax information" and "as far as [he] knew that's how [he] was supposed to file." Gregg acknowledged that his return may have some "discrepancies."

C.      *Plaintiffs' purchase of solar lenses*

According to the sworn testimony and documentary evidence, in 2010 Gregg purchased nine solar thermal lenses from RaPower3. (Ptfs' Ex 8 at 2-3.) Gregg testified that each lens cost $3,000. Plaintiffs submitted an unsigned invoice from RaPower3 for the purchase of seven lenses described in that document as "units," for a total reported price of $21,000, and two contracts titled "Alternative Energy System Purchase Referral Fee Contract," one for the purchase of two "systems" on February 9, 2010, and the other for an additional seven "systems" purchased April 17, 2010. (Ptfs' Exs 1 at 1, Ex 8 at 2-3.) Neither of those contracts is signed. (Ptfs' Ex 8 at 2-3.)

According to Gregg's testimony, he purchased the nine lenses in February and April 2010, making periodic payments. Plaintiffs' Exhibit 1 reflects nine periodic payments of $700 each, for the seven lenses purchased in April 2010. (Ptfs' Ex 1 at 1.) The total paid in 2010 for those seven lenses was $6,300. Gregg continued to make payments in 2011 and possibly years thereafter. However, the focus of this case is on 2010.

The initial 2010 contract for the purchase of seven lenses is entitled "Alternative Energy System Purchase Referral Fee Contract." (Ptfs' Ex 8 at 2.) That contract indicates that Gregg purchased the "Alternative Energy Systems," that he made "payment at the time of signing the

[agreement]," and that Gregg, as the purchaser, "agree[d] to make the Systems available to IAS as a reference for marketing and sales purposes to show and demonstrate to potential customers ('New Customers'),'" and in return for said purchase, Gregg "earned and shall thereafter receive a referral fee [of 0.0042 percent] for services performed by allowing access and use for sales purposes, for each System purchased * * *[.]" (*Id*.) The court notes that the referral fee contract has Gregg's name typed, as well as the date, but that there is no signature by any of the parties involved in the purchase contract. (*Id*.) The contract does identify a RaPower3 "Sponsor" named Roger Freeborn.

Gregg explained his involvement in the renewable energy enterprise as follows. RaPower3 is a company trying to develop renewable power and/or heat, depending on what turns out to be the most profitable application. Gregg testified that he "looked at that venture and thought it would be a good way to invest money into a small business." Gregg testified he bought the lenses from RaPower3 and then leased them back to LTB, LLC (hereinafter LTB). Gregg testified that the lenses are physically located in Delta, Utah, but that he is not certain whether the lenses he "purchased" had ever actually been placed in use; Gregg acknowledged that the lenses could be in storage in a warehouse in Utah. Gregg added that, although the lenses may or may not be currently in use, they are available for "marketing" and potential "sales purposes." Gregg did submit a letter from RaPower3 which states:

> "This letter is regarding the 'Alternative Energy Systems' that you purchased from RaPower3 LLC. RaPower3 put into service your equipment on or before December 31, 2010. This will qualify you for the Internal Revenue Services [*sic*] solar energy tax credit."

(Ptfs' Ex 4 at 1.)

The undated letter is signed by a Greg Shepard (Shepard), who is identified as Director of Operations. (*Id*.) Shepard was not present at trial and did not testify.

Gregg testified that he has never seen or touched the lenses, and that they were shipped by RaPower3 directly to LTB. Gregg testified that he has nothing to do with the lenses after the purchase from RaPower3; LTB is responsible for assembly, installation, and maintenance of the lenses, all of which takes place in Utah. Gregg testified that the lenses have to be put together in a "lens format" or array to create heat to either clean water or make steam for electricity.

Gregg testified that the lease to LBT was arranged by RaPower3, and that he has no say over who the lenses are leased to. Gregg was also uncertain of the term of the lease but testified that he believed it was 30 years. Gregg also testified that the lease payments do not begin until the lenses are operational.

Gregg's testimony was rife with uncertainties. For example, Gregg testified that he leases the lenses to LTB, and that he is supposed to be receiving rental income and commissions in return. At one point, Gregg testified that he did not know "off the top of [his] head" how much income he received in 2010 but he was certain that he had received *some amount* in the form of a commission that year. Traub pointed out that Plaintiffs' tax year 2010 Schedule C for the solar energy system does not report any gross receipts or income of any kind. (Def's Ex A at 13.) Gregg then responded by stating that he may *not* have earned any income from the lenses in 2010. There was only scant testimony regarding the terms or conditions of the lease and commissions. Gregg was uncertain as to the length of the lease, but *believed* it was 30 years. Furthermore, Gregg testified that he is not clear about how much rental income he is supposed to receive from LTB. Gregg testified that there was an agreement for annual rental income on each lens, but that a portion of the payment goes to RaPower3 to "pay down the cost of the lenses." Gregg elaborated by explaining that, instead of receiving more annual rental income, a good portion of the lease payments go from LTB to RaPower3 to "rectify the full unit price, because

[Gregg] only made a down payment." When pressed on the matter, Gregg testified that he believed he is supposed to receive somewhere between $112 and $200 per year, the balance going to RaPower3 to pay down the balance owed on the lenses Gregg purchased. Gregg later acknowledged that his rental income is contingent on the lenses being operational and producing heat.

## II. ANALYSIS

In the Oregon Tax Court, the party seeking affirmative relief has the burden of "proving his case by a preponderance of the evidence," which means "the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); ORS 305.427 (2013).[5] Plaintiffs in this case are the party seeking affirmative relief and they therefore bear that burden. In practical terms, this case hinges on whether Plaintiffs have established their entitlement to the depreciation they claimed on their 2010 tax return by a preponderance of the evidence presented at trial.

Pursuant to ORS 316.007, it is the stated intent of the Oregon legislature to make this state's personal income tax system effectively identical to the provisions of the federal Internal Revenue Code (IRC). ORS 316.048 incorporates the provisions of the federal IRC, with certain exceptions not here implicated. Additionally, the US Supreme Court has declared that the "objective economic realities of a transaction rather than * * * the particular form [that] the parties employ[]" form the basis for determining taxes. *Frank Lyon Co. v. U.S.*, 435 US 561, 573, 98 S Ct 1291, 55 L Ed 2d 550 (1978) (citation omitted).

///

///

___

[5] The court's references to the Oregon Revised Statutes (ORS) are to the 2009 edition unless noted otherwise.

IRC section 167 provides for a depreciation deduction as follows:

"(a) General rule.
    "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) –
        "(1) of property used in the trade or business, or
        "(2) of property held for the production of income."

The code further provides that "[t]he basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 * * *."  IRC § 167(c)(1).  IRC section 1011 provides that basis is to be determined under section 1012, which, in the end, provides that basis is generally "the cost of such property."

As a general rule, depreciation is not allowed unless the property the taxpayer is depreciating is connected with a trade or business.  IRC § 162.[6]

A prerequisite for depreciation is that the item for which depreciation is claimed be placed in service or available for use or sale.  That requirement is found in IRC section 167, which allows for a depreciation deduction if the property is either *used* for a business purpose or *held* for the production of income.  IRC § 167(a).  In certain instances, IRC section 183 comes into play.  In this case, the section 183 limitations are implicated because there is a question as to whether Gregg was involved in a "trade or business" in 2010.  That is so because Gregg's position is that he purchased the lenses, but the lenses were sent directly from the seller to a third party, LBT, and LBT, according to the testimony, is responsible for installation and maintenance of the lenses in a solar array, with payments to be made to Plaintiffs on a contingent basis if and when the lenses become operational.  Gregg testified that he has never seen one of the lenses he

---

[6] IRC section 162 provides in part: "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

purchased, and has never traveled to Utah where the lenses are either stored or in service, and all of the contractual arrangements between the seller and LBT were made by the seller. Gregg's involvement was very limited; all he has done, at most, was to send the seller some money in 2010. The court concludes, based on the evidence before it, that Gregg was not involved in a trade or business and any deductions are not allowed under IRC sections 162 and 167.

Under IRC section 183, a taxpayer pursuing an "activity not engaged in for profit" may nonetheless take allowable deductions, including depreciation, "but only to the extent that taxpayer's gross income from the 'activity not engaged in for profit' exceeds the deductions allowed  * * * under IRC section 183(b)(1)."  *Hillenga v. Dept. of Rev.*, __ OTR __, TC 5086 at 10 (May 2014), citing IRC § 183(b)(2). Plaintiffs reported no gross income, which effectively ends the inquiry. Moreover, the nine-factor nonexclusive list found in the applicable treasury regulation designed to aid in a determination of whether an activity is one "not engaged in for profit" weighs heavily in favor of the conclusion that Gregg's solar lens activity was, indeed, an activity not engaged in for profit. Given that Plaintiffs' only deduction related to activity in 2010 was for depreciation, and there was no gross income reported or established at trial, Plaintiffs may not deduct their claimed depreciation. Although the court could end its analysis at this point and rule against Plaintiffs, the court will briefly continue its analysis, in part, because of Gregg's sincere belief that the claimed depreciation should be allowed.

There are numerous other requirements in the federal tax code and treasury regulations for depreciation, including a proper establishment of the taxpayer's basis, which is governed by code sections 167(c) and 1011, an accepted depreciation method as outlined in IRC section 168(b)(1), a proper recovery period per IRC section 168(c), at-risk limitations in IRC section 465, and the IRC section 469 passive loss rules, to name a few.

In *Miller v. Dept. of Rev.*, 327 Or 129, 139, 958 P2d 833 (1998), the Oregon Supreme Court ruled:

> "A taxpayer has the burden of establishing the reasonableness of a depreciation deduction and must justify the method used. IRC § 167(a) (1985); *Reed,* 310 Or at 264. The method of depreciation that a taxpayer uses does not establish the remaining useful life of the asset being depreciated. Regardless of the depreciation method used, the taxpayer must establish the remaining useful life of the asset and, in doing so, is to consider a variety of factors. *See* Treas. Reg. § 1.167(a)-1(b) (stating the rule and identifying factors to be considered by taxpayer in determining remaining useful life)."

Plaintiffs in this case have simply failed to establish by a preponderance of the evidence the reasonableness of the depreciation deduction and, more importantly, have failed to justify the method used to calculate the depreciation claimed on their 2010 return. Plaintiffs took essentially all of the depreciation ($21,960 of the total asserted cost of $27,000 for the nine solar lenses) in 2010. (Def's Ex A-13.). Their out-of-pocket expense that year was, at most, $6,300.

The court has a number of concerns with Plaintiffs' case. To begin with, the evidence establishing Plaintiffs' purchase of the lenses is less than ideal. Plaintiff submitted an invoice from RaPower3 dated April 17, 2010, (Invoice) and two referral fee contracts. (Ptfs' Exs 1 at 1, Ex 8 at 2-3.) There was no testimony at trial as to how the payments were made (*e.g.*, cash, check, credit card, etc.). The invoice is generic and unauthenticated. Furthermore, that invoice shows nine payments by Plaintiffs in 2010, all for $700, seven of which were reportedly made by check. It would have been a simple matter for Gregg to have produced copies of those cancelled checks at trial. Gregg, who is in the garden nursery business, with a small landscaping business operated on the side, is admittedly neither an attorney nor an individual with prior experience in court procedures. Nonetheless, the court provides considerable information on its website as to how to present one's case, as well as a searchable database of prior Oregon Tax Court decisions made available to provide the public with relevant information on both the law and court

procedure. As for the referral fee contracts between RaPower3 and Gregg, both are unsigned by either Gregg or the identified contract "Sponsor" Roger Freeborn. (Ptfs' Ex 8 at 2-3.) There is, therefore, some question as to whether Plaintiffs actually paid the $6,300 in 2010 that they claimed for nine solar lenses.

More telling were the statements and sworn trial testimony regarding Gregg's calculation of depreciation. In his opening statement, Gregg stated that he took depreciation on the amount he felt was the business loss that he had at the time, using his best knowledge. On cross-examination, Traub asked Gregg how he arrived at his depreciation figure of $21,960. Gregg's testimony, prefaced by a statement that he was not a "tax person," was that he was "not sure" how he calculated the depreciation. Gregg elaborated by testifying that he used a tax software program and that he read some unspecified "tax information" and *believed* that the depreciation he claimed was based on how he *believed* he was supposed to file. According to the evidence, both testimonial and documentary, Gregg's actual 2010 expenses for the solar lenses were only $6,300. (Ptfs' Ex 1 at 1.) When questioned by the court, Gregg conceded that point.

There is also a genuine issue as to whether the lenses Gregg contends Plaintiffs purchased were ever placed in service or were (and remain) being stored in a warehouse. Gregg acknowledged on cross-examination that he was not certain whether the lenses were placed on the "array" (*i.e.*, whether the lenses were or are in use) in Utah or stored someplace in boxes in a warehouse. Gregg countered that, although the lenses may not be, or have been, in use, they were available for advertising and potential sales purposes. Gregg did not elaborate on that point either during direct testimony or on cross-examination. Additionally, there is no evidence before the court, either in the form of written documents or sworn testimony, that the lenses Plaintiffs claimed to have purchased were ever manufactured, or whether any money Plaintiffs may have

sent to RaPower3 simply went to fund operations or solicit additional "purchasers." Frankly, the court is not certain whether Plaintiffs were involved in a purchase or, rather, some form of sophisticated marketing investment scheme. Plaintiffs submitted two documents prepared by law firms in Utah addressing the "tax consequences" and "possible tax saving benefits of purchasing energy equipment[.]" (Ptfs' Exs 2-3.) It appears as though only one of those two documents was prepared for the purported seller of the lenses Plaintiffs purchased, RaPower3. (Ptfs' Ex 3.) That document is dated August 8, 2012, is addressed to "Potential RaPower-3 Customer[s]," and states, in part, that "there are four possible ways to reduce tax liability: energy credits; depreciation; § 179 costs, [and] deductions and expenses." (*Id*. at 1.) The other document, dated October 31, 2012, is titled "MEMORANDUM," and is written to a company identified as "SOLCO I, LLC." (Ptfs' Ex 2 at 1.) There was no testimony regarding that document other than a brief reference to the exhibit. The court has reviewed the document and finds no reference to RaPower3, the purported seller of the lenses at issue in this case.

Gregg testified that he earned nominal income in 2010; less than $200. However, Plaintiffs did not report any income from the solar lenses on their 2010 Schedule C. Gregg testified that the lenses may not have been in use, but submitted two unsigned referral fee contracts from the seller stating that the "alternative energy systems" Plaintiffs purchased were "put into service * * * on or before December 31, 2010." (Ptfs' Ex 4 at 1.)

/ / /

/ / /

/ / /

/ / /

/ / /

III.  CONCLUSION

After carefully considering the evidence, the court concludes that Plaintiffs have failed to establish their entitlement to the $21,960 in depreciation they claimed on their 2010 federal Schedule C, which flowed over to their 2010 Oregon return.  Accordingly, the court concludes that Defendant's adjustments to Plaintiffs' 2010 Schedule C were proper.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of October 2014.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on October 13, 2014. The court filed and entered this document on October 13, 2014.*