DELBERT C. SOWERBY and FLORENCE SOWERBY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sowerby v. Commissioner
Docket No. 17170-81.
United States Tax Court
T.C. Memo 1984-21; 1984 Tax Ct. Memo LEXIS 648; 47 T.C.M. (CCH) 897; T.C.M. (RIA) 84021; January 11, 1984. Brian J. Van Voris, for the petitioners. Rebecca T. Hill, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined deficiencies of $16,466 and $12,873, respectively, for petitioners' 1977 and 1978 taxable years. After concessions by the petitioners, the issue for decision is whether petitioners are entitled to claim investment tax credits and depreciation on a sawmill they allegedly purchased and leased back, with option to buy, to the sellers. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Redding, California, when *649 their petition herein was filed. In 1977, as a result of discussions with his accountants, petitioner Delbert C. Sowery (hereinafter Delbert) decided to diversify his investment portfolio. Thereafter, Delbert learned that a sawmill owned by Betty Perry Loveness (hereinafter Betty) was for sale, at an asking price of $800,000. [1] Delbert began negotiating with Betty and her sons, David and Robert Perry, and also discussed the sawmill with his financial advisors. Delbert decided that the sawmill was worth between $600,000 and $700,000. He further concluded that it would increase in value by at least 10 percent per year. On December 30, 1977, Delbert entered into the following agreement with Betty and her sons: 1. Total Price $500,000.00 2. Down Payment $100,000.00 3. Balance - $400,000.00 at 8% amortized over 17 years with monthly payments of $3592.00. 4. Perry Lumber Mill including 5 acres surrounding land, RR spur, and all buildings and equipment sold to Sowerby on Contract of Sale. 5. Seller agrees to lease back total purchase on a net, net, net basis from buyer using a 5 to 7 year lease. 6. Seller agrees to indemnify buyer and name buyer on all insurance *650 including liability insurance. 7. Buyer agrees to sell entire purchase to Perry Brothers (David and Robert) and Perry Brothers (David and Robert) agree to buy same in condition found at that time within 5 to 7 years from purchase for $500,000.00 total purchase price. 8. Seller agrees to credit buyer on remaining balance note $3592.00 each month and buyer agrees to accept this as lease payment. 9. All cost of operating mill including insurance, taxes, gas, electric, labor, etc. will be paid by Lessee. 10. Lessee may sub-lease all property and equipment at their discretion as long as no change in agreement between buyer and seller is jeopardized [sic]. 11. All of the above including down payment of $100,000.00 is subject to buyers' acceptance of: 1. Full inventory list. 2. Preliminary title report. Also buyer and seller must reach final agreement on lease and escrow papers. /S/ Delbert C. Sowerby, M.D. Delbert C. Sowerby, M.D., Buyer /S/ Betty Perry Loveness Betty Perry Loveness, Lessee /S/ Delbert C. Sowerby, M.D. Delbert C. Sowerby, M.D., Lessor /S/ Robert S. Perry Robert S. Perry, Future Buyer /S/ Betty Perry Loveness Betty Perry *651 Loveness, Seller /S/ Dave Perry Dave Perry Also on December 30, 1977, Delbert drew a check payable to Betty in the amount of $100,000, which she promptly cashed. Following the execution of the aforegoing document, Delbert asked David Morrow, an attorney, to draft documents memorializing his agreement with Betty and her sons. Mr. Morrow replied that he would get to it when he could. Mr. Morrow in due course produced the following "Agreement - Sale": AGREEMENT - SALE THIS AGREEMENT IS MADE this 28th day of September, 1978, between BETTY PERRY LOVENESS, of Redding, California, seller, and DELBERT C. SOWERBY and F. HELEN SOWERBY, of Redding, California, buyers. 1. Sale of Business. Seller agrees to sale and buyer agrees to purchase, free from all liabilities and encumbrances, the sawmill and lumber business now owned and operated by seller at Redding, California, including the goodwill of the business as a going concern, all of sellers rights under its contracts, *652 licenses, and agreements, and all assets and property owned and used by seller in such business as specified in Exhibit "A", other than properties specifically excluded. This sale does not include the cash on hand or in banks at the date of closing. 2. Purchase Price. As full payment for the transfer of the assets by seller, buyers shall pay to sellers the sum of Five Hundred Thousand ($500,000.00) Dollars. The purchase price shall be allocated among the assets as follows: 3. Terms of Payment. The purchase price, as set forth in section 2, shall be paid by buyers to seller as follows: The sum of One Hundred Thousand ($100,000.00) Dollars as down payment, receipt of which is hereby acknowledged by seller; The balance of Four Hundred Thousand ($400,000.00) Dollars, by a promissory note payable in equal monthly installments of Three Thousand Five Hundred Ninety-two ($3,592.00) Dollars each. An installment shall be due and payable on the 1st day of each month, the first such payment to be made on the 1st day of February, 1978, and the note shall bear interest at the rate of Eight percent (8%) per annum, said installment payments hereinabove set forth shall include interest, *653 and said payment shall be credited first to payment of interest and the balance thereof to principal. 4. Time of Closing. The closing shall take place at the office of seller's attorney, on      , 19  . Seller shall deliver to buyer such instruments of transfer as are necessary to transfer to buyers the business and property referred to in Section 1. Such instruments of transfer shall effectively transfer to buyer full title to the business and property referred to in Section 1, free of all liens and encumbrances, save and except those set forth in the report of title dated January 6, 1978, a copy of which is attached hereto as Exhibit "A". 5. Covenant not to compete. Seller shall not engage in a business similar to that involved in this transaction in any capacity directly or indirectly within the State of California or Oregon, for a period of seventeen years from the date of closing, or so long as buyers or their successors carry on a like business, whichever first occurs. 6. Representations of seller. Seller represents and warrants that: * * * B. She is the owner of and has good and marketable title to the property referred to in Section 1, free of all *654 restrictions on transfers or assignments and of all encumbrances except for those disclosed in Exhibit "A". * * * 7. Risk of loss by fire. Seller assumes all risk of destruction, loss, or damage by fire prior to the closing of this transaction. 8. Assumption of liabilities. Seller and buyers agree that buyers shall not be liable for any of the obligations or liabilities of seller of any kind and nature whatsoever and that seller will and does hereby indemnify buyers against any and all liability of any contracts, accounts and obligations of any kind or nature whatsoever. This agreement shall bind the parties hereto and their legal representatives and assigns. * * * Seller has furnished to buyers an accurate list and summary description of all machinery, equipment, facilities, and other tangible assets in sellers plant. Said list and description of the personal property is attached hereto as Exhibit "B" and incorporated thereby. Seller represents and warrants that in the event any personal property used in connection with the said lumber business and omitted from the schedule shall be added to said schedule and title thereto shall pass immediately to buyers. *655 10. Access to records. Seller shall give to buyers free access to buyers, during business hours, to allow buyer to make copies of all books and records of sellers. At the closing, seller shall execute and deliver to buyers an undertaking whereby seller will assume and agree to pay and discharge all liabilities of seller, and hold buyers harmless therefrom including but not limited to the following: A. Any liabilities whenever accrued for federal income taxes or for income or franchise taxes or any other taxes owned by any state or other taxing authority, including sales tax on this transaction, or interest or penalties thereon. * * * Executed at Redding, California on the date first above written. /S/ Delbert C. Sowerby, M.D. DELBERT C. SOWERBY, Buyer /S/ Betty Perry Loveness BETTY PERRY LOVENESS, Seller /S/ Helen Sowerby F. HELEN SOWERBY Mr. Morrow also prepared a memorandum of agreement of sale which was recorded in Shasta County, California, on February 13, 1979, and which reads as follows: THIS AGREEMENT IS MADE AND ENTERED INTO THIS 10th DAY OF OCTOBER, 1978, BY AND BETWEEN BETTY PERRY LOVENESS, who acquired title as BETTY R. PERRY, HEREINAFTER CALLED *656 SELLER, AND DELBERT C. SOWERBY AND F. HELEN SOWERBY, HIS WIFE, HEREINAFTER CALLED PURCHASER. SELLER HEREBY AGREES TO SELL TO PURCHASER AND PURCHASER HEREBY AGREES TO PURCHASE FROM SELLER, the property described in Exhibit "A", AT THE PRICE AND UPON THE TERMS AND CONDITIONS SET FORTH IN THAT CERTAIN UNRECORDED AGREEMENT OF SALE OF EVEN DATE HEREWITH, ENTERED INTO BY AND BETWEEN THE PARTIES HERETO. /S/ Betty Perry Loveness BETTY PERRY LOVENESS, SELLER /S/ Delbert C. Sowerby, M.D. DELBERT C. SOWERBY, PURCHASER /S/ F. Helen Sowerby F. HELEN SOWERBY, PURCHASER At some time in 1978, two similar leases, prepared by Mr. Morrow, were signed, one by Delbert and F. Helen Sowerby as lessors and by Betty as lessee, and the other by Robert Perry. These two documents, both of which are dated December 30, 1977, provide in pertinent part: WITNESSETH: That for and in consideration of the rents, covenants and agreements herein contained, Lessors do hereby lease, demise and let unto Lessee that certain portion of real property situated at Shasta County, California as further described in Exhibit "A", together with all that certain furnishings, equipment, and other personal property *657 set forth in Exhibit "B", by this reference incorporated herein. The term of this lease shall be for a period of five years, commencing December 30, 1977, to and including December 30, 1983 [sic].
Lessee shall pay Lessors as rental therefor, the sum of Three Thousand Five Hundred Ninety-two ($3,592.00) Dollars monthly, in advance, on the 1st day of each and every month during said term, for the entire five year lease period, for a total rental of $218,220.00 dollars, [sic] lawful money of the United States
* * * 5. That Lessee shall furnish, at no cost to Lessor, all utilities including but not limited to water, electricity, power, gas, heat, cooling, garbage, and janitorial service. Lessee shall pay all taxes and assessments on the real property that is herein leased, during the term hereof, including all city and county taxes, and the Lessee shall also pay all taxes and assessments on any of the leased personal property, including all fixtures, equipment and improvements of every kind on said leased premises. Lessee shall pay before delinquency any and all taxes, assessments, license fees, and public charges levied, assessed, or imposed and which become payable during *658 the lease term upon Lessee's fixtures, furnishings, equipment and any personal property installed or located in the premises. * * * The leases further provide that the lessee would maintain policies of comprehensive liability insurance, including property damage, and that in the event of a casualty lessee would claim no interest in any insurance settlement arising out of such casualty. Delbert had Robert Perry sign a copy of this lease to let Robert Perry know that he expected him to participate in operating the sawmill. Mr. Morrow also prepared an option agreement, which was dated December 30, 1977, but signed September 7, 1978, by Delbert and F. Helen Sowerby as sellers and by Betty as buyer. It provided in pertinent part that: Whereas Sellers and Buyer have entered into a lease of the property referred to above, wherein Sellers are Lessors and Buyer is Lessee, which lease in dated December 30, 1977. WITNESSETH Sellers, for and in consideration of the lease hereinabove referred to, and other good and valuable consideration, receipt of which is hereby acknowledged, do hereby agree as follows: Provided that Buyer is not in default in any of the terms and conditions *659 of the lease hereinabove referred to, Buyer shall have the exclusive option to purchase the real and personal property set forth in Exhibit "A", and "B", together with all additions and modifications thereto upon the following terms: (a) The total purchase price shall be the sum of Five Hundred Thousand ($500,000.00) Dollars in cash, lawful money of the United States of America, to be paid as follows: (1) The then balance due from Sellers to Buyer on that certain promissory note and Deed of Trust of date of December 30, 1977, executed by Sellers to Buyer for the purchase of the property herein, shall be assumed, or in the alternative cancelled and delivered up, if Buyer so desires, by Buyer. Said balance shall be credited to the purchase price. Said Deed of Trust executed by Sellers, naming Buyer as beneficiary was executed on       and recorded on       in the public records of Shasta County in Book     of Official Records at Page    . (2) The balance of the purchase price after crediting the Buyer with the balance of the note and Trust Deed set forth in subparagraph (1) above, shall be paid by Buyer to Sellers in cash or by certified check on or before March 30, 1983. *660 (3) It is understood and agreed that the sums paid by Buyer to Sellers under the lease hereinabove referred to shall not be applied to the purchase price. (b) It is expressly understood and agreed by the parties hereto that Buyer may exercise this option only after January 1, 1983. Further that this option shall be exercised by written notice, signed by Buyer, delivered to Sellers on or before January 1, 1983.
The parties hereto do mutually agree that in the event this option is exercised by the Buyer, notice of election shall be in writing and may be given to the Sellers at any time prior to January 1, 1983. In the event this option is exercised, the transfer of said personal property shall take effect only as of close of escrow, and the Buyer shall be deemed to be the owner thereof as of such date and the Sellers shall duly endorse and cause to be duly endorsed and delivered all documents of title to the Buyer on and as of such date, and the purchase price, as hereinafter established, shall be paid as of such date. All parties hereto agree to execute all papers, documents, applications, notices, bills of sale and other instruments of any kind or nature necessary to effect *661 the transfers herein mentioned and to effect the terms of this option agreement. That in the event this option to purchase is exercised, all notices required under the laws of the State of California relating to the sale of personal property shall be given in accordance with such laws. In the event the Buyer fails to exercise the option within the stipulated time, her rights hereunder shall cease and terminate and the Sellers shall be released from all liability of any nature to Buyer under this option. In the event that either party is required to bring legal action to enforce the provisions hereof, or to enforce the provisions of any of the terms of this option surviving its execution, the prevailing party in such litigation shall be entitled to reasonable attorney's fees as fixed by the Court in such litigation.
All rent payments due to Delbert from Betty were credited against principal and interest on the amount of the purchase price owing to Betty. No cash other than the original $100,000 payment changed hands between Delbert and Betty during the years in issue. OPINION The issue presented is whether petitioners had an interest in Betty's sawmill sufficient to entitled *662 them to deduct depreciation expense on the sawmill and claim the investment tax credit thereupon. Petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
In Helvering v. F. & R. Lazarus & Co.,308 U.S. 252 (1939), the taxpayer, a department store, transferred legal title to two buildings and a 99-year lease to a third building to a bank, as trustee for land-trust certificate holders. The trustee simultaneously leased the properties back to the taxpayer for 99 years, with options to renew the lease. Respondent disallowed the taxpayer's depreciation deductions on the buildings, contending that the statutory right to depreciation followed legal title. The Board of Tax Appeals concluded that the transaction between the taxpayer and the bank was, in substance, a mortgage loan and held that the taxpayer was entitled to the depreciation deduction. The Sixth Circuit affirmed as did the Supreme Court. In noting its agreement with the Board of Tax Appeals' conclusion that the transaction was actually a loan secured by property, the Supreme Court regarded the "depreciation fund" required by the lease as an amortization fund designed *663 to pay off the loan principal in the stated period. More recently, in Frank Lyon Co. v. United States,435 U.S. 561 (1978), the Supreme Court upheld the form of a sale-leaseback transaction. Worthen Bank & Trust Co. (Worthen) planned to construct a bank and office building. Because of state usury laws and Federal Reserve System regulations, Worthen was prevented from erecting the building itself.As an alternative, Worthen proposed a sale-leaseback transaction. The bank regulatory authorities approved the plan as long as the title to the property was held by an independent third party and Worthen retained an option to purchase the property after the 15th year of the lease. With these requirements in mind, and after obtaining a commitment for permanent financing, Worthen entered into negotiations with several interested entities. The Frank Lyon Co. (Lyon) was selected to be the buyer-lessor of the bank building. Thereafter, Worthen and Lyon executed interlocking agreements wherein Worthen leased the underlying land to Lyon for 76 years, sold the building to Lyon in stages as it was constructed, and leased the building back from Lyon for a 25-year primary term *664 and eight 5-year option terms. The sale and leaseback were effected simultaneously. Lyon purchased the building for $7,640,000 financed in part by a loan from New York Life for $7,140,000. The remaining $500,000 was paid by Lyon to Worthen from its own funds. Lyon assumed personal responsibility for the repayment. The loan was further secured by an assignment of the building lease and a mortgage on the building. Worthen had options to repurchase the building at periodic intervals for the amount of the outstanding mortgage plus Lyon's original $500,000 investment, with 6-percent interest compounded thereon. The lease was a net lease with Lyon's only current financial obligation being the quarterly mortgage payments. Rent payments for the primary term were calculated to exactly equal the mortgage payments. Thereafter, the rent was reduced by approximately 50 percent to $300,000 per annum for each elected extended term. Respondent disallowed Lyon's claimed deductions for depreciation on the building and interest on the mortgage loan, taking the position that Lyon was not the owner for tax purposes. Respondent asserted that Lyon merely loaned Worthen $500,000 and acted *665 as conduit for the mortgage payments from Worthen to New York Life. The Supreme Court held that Lyon was the owner of the property for tax purposes. The Court refused to accept the Government's argument that Lazarus controlled. It distinguished Lazarus as follows: The Lazarus case, we feel, is to be distinguished from the present one and is not controlling here. Its transaction was one involving only two (and not multiple) parties, the taxpayer-department store and the trustee-bank. The Court looked closely at the substance of the agreement between those two parties and rightly concluded that depreciation was deductible by the taxpayer despite the nomenclature of the instrument of conveyance and the leaseback. * * * The present case, in contrast, involves three parties, Worthen, Lyon, and the finance agency. The usual simple two-party arrangement was legally unavailable to Worthen. Independent investors were interested in participating in the alternative available to Worthen, and Lyon itself (also independent from Worthen) won the privilege. Despite Frank Lyon's presence on Worthen's board of directors, the transaction, as it ultimately developed, was not *666 a familial one arranged by Worthen, but one compelled by the realities of the restrictions imposed upon the bank.Had Lyon not appeared, another interested investor would have been selected. The ultimate solution would have been essentially the same. Thus, the presence of the third party, in our view, significantly distinguishes this case from Lazarus and removes the latter as controlling authority. [435 U.S. at 575-576.] The District Court in Frank Lyon found that the rents were reasonable throughout the period of the lease, and the Supreme Court accepted its finding. 435 U.S. at 569. The Court also relied on the fact that Worthen could walk away from its relationship with Lyon at the end of the 25-year primary lease, and would probably do so if the option price were more than the then current worth of the building to Worthen. 435 U.S. at 583. [2] In holding for Lyon, the Court stated "we emphasize that we are not condoning manipulation by a taxpayer through arbitrary labels and dealings that have no economic significance." 435 U.S. at 583. *667 Respondent contends that this case is factually akin to and should be governed by Helvering v. F. & R. Lazarus & Co.,supra; petitioners contend that the case is more analogous to Frank Lyon Co.,supra. We agree with respondent. On December 30, 1971, Delbert entered into an agreement with Betty and her two sons. Overlooking numerous drafting mistakes, the agreement provided that Delbert would buy Betty's sawmill for $500,000, to be paid $100,000 down and the remainder in a purchase money mortgage. Betty agreed to lease the property back under a five to seven year net, net, net lease. Delbert agreed to sell the property to Betty's sons for $500,000 within five to seven years. Betty agreed to credit $3,592 each month against Delbert's $3,592 monthly principal and interest obligation on the purchase money mortgage, and Delbert agreed to accept this as full satisfaction of each month's rent under the lease. Finally, the agreement was made contingent upon the parties' reaching final agreement on lease and escrow papers. Title to the sawmill was not transferred to petitioners in 1977. The foregoing transaction did not pass ownership of the sawmill *668 to petitioners. Either party had the right to undo the agreement if no satisfactory agreement on lease and escrow papers was reached. At most, this agreement is a contract to purchase, accompanied by a payment of earnest money. We therefore conclude that petitioners had no ownership interest, either legal or beneficial, in the sawmill in 1977.
In 1978, the agreement between Delbert and Betty was evidently modified. The parties signed a lease agreement, a sale agreement, and an option agreement giving Betty the option to repurchase the mill in 1983 for $500,000. The parties also recorded, on February 13, 1979, a memorandum of agreement which stated that Betty agreed to sell, and petitioners to purchase, the sawmill. Rental payments under the lease continued to exactly offset petitioner's obligation for principal and interest under the purchase money mortgage. The sale agreement included the following clause: Time of closing. The closing shall take place at the office of seller's attorney, on      , 19  . Seller shall deliver to buyer such instruments of transfer as are necessary to transfer to buyers the business and property * * * No date of closing was agreed *669 upon, and as far as we can tell from this record, title to the sawmill was not transferred to petitioners in 1978. Even if we assume, arguendo, that title to the sawmill was transferred to petitioners in 1977, we are convinced that the above-described transactions may not be recognized for tax purposes. Unlike the sale-leaseback transaction in Frank Lyon Co.,supra, the sale-leaseback before us was financed through a purchase money mortgage, rather than with funds advanced by an independent third party. As in Frank Lyon Co.,supra, the rent due to petitioners exactly offset their principal and interest obligations, but here there is no evidence that the rent was a fair market rental for the mill. [3] In 1977 or 1978 Delbert gave Betty the option to repurchase the sawmill in 1983 for $500,000, [4] despite his stated belief that the mill was worth between $600,000 and $700,000 in 1977 and would appreciate in value 10 percent per year thereafter. Delbert must thus have thought it extremely unlikely that Betty would walk away from her option to repurchase; even had she done so, petitioners may still have been able to require Betty's sons to purchase the *670 mill under the December 30, 1977 agreement. We further note that petitioners have failed to show that the purported sale-leaseback could not have been structured as a financing transaction, unlike Frank Lyon Co.,supra, in which the Supreme Court noted that Worthen was prevented by the Federal Reserve System regulations from borrowing funds and constructing its own building. [5]
*671 On the basis of the foregoing factors, we believe this case is distinguishable from Frank Lyon Co.,supra, and that the various agreements described above are "arbitrary labels and dealings that have no economic significance" such as the Supreme Court explicitly refused to condone. 435 U.S. at 583. We conclude that the agreement embodied in the various documents signed by petitioners and Betty in 1977 and 1978 was in economic effect nothing more than a finance transaction whereby petitioners loaned Betty $100,000 secured by the sawmill. Helvering v. F. & R. Lazarus & Co.,supra.It follows that petitioners' purported purchase of Betty's sawmill cannot be recognized for tax purposes. Decision will be entered for the respondent.
Footnotes
1. The sawmill was experiencing financial difficulties at the time of these negotiations. Betty continued to operate the sawmill in 1978, 1979 and 1980. She filed for bankruptcy on September 26, 1980.↩
2. The Supreme Court also noted that: the Government is likely to lose little revenue, if any, as a result of the shape given the transaction by the parties. * * * While it is true that Worthen paid Lyon less to induce it to enter into the transaction because Lyon anticipated the benefit of the depreciation deductions it would have as the owner of the building, those deductions would have been equally available to Worthen had it retained title to the building. * * * [Frank Lyon Co. f. United States,435 U.S. 561, 580 (1958).] But see Wolfman, The Supreme Court in the Lyon's Den: A Failure of Judicial Process, 66 Cornell L. Rev. 1075, 1088, 1095-1098↩ (1981).
3. In Frank Lyon Co. v. United States,supra,↩ the Supreme Court accepted the District Court's reasoning that since the negotiations between Lyon and Worthen were arm's-length, the rent arrived at was fair market rent. In that case, the parties negotiated rent for an initial period at a rate equal to Lyon's obligations to the mortgage lendor. The parties also agreed that Worthen could extend its lease beyond that time at certain negotiated rents. In the instant case, the lease was for less than the time required to amortize the purchase money mortgage, and there is no indication that either party cared whether the rent fixed by the lease approximated the fair market rental value of the sawmill.
4. It is not at all clear that the December 30, 1977 agreement providing that Delbert could require Betty's sons to purchase the mill for $500,000 in five to seven years was ever abrogated. ↩
5. In Frank Lyon Co.,supra,↩ the Supreme Court noted that the tax benefits claimed by Lyon as a result of the sale-leaseback would have been available to Worthen had it retained title to the building. We note that Betty was in financial difficulty in 1977 and declared bankruptcy in 1980. It thus appears doubtful that the credits and depreciation deductions purportedly transferred to petitioners would have been of any use to Betty had she claimed them.