**MARY KAY, INC.,**
*Plaintiff,*

*v.*

**DEPARTMENT OF REVENUE,**
*Defendant.*

(TC 4552)

Bruce H. Cahn, Ball Janick LLP, Portland, and Maryann B. Gall and Todd S. Swatsler, Jones, Day, Reavis & Pouge, Columbus, filed the motion and argued the cause for Plaintiff (taxpayer).

Douglas M. Adair, Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Defendant (the department).

Decision for Defendant rendered May 15, 2003.

**HENRY C. BREITHAUPT, Judge.**

Plaintiff (taxpayer) appeals from a magistrate decision holding that cars leased as part of the Mary Kay Career Car Program (Career Car Program) were properly included by Defendant Department of Revenue (the department) in the property factor for purposes of calculating taxpayer's income apportionable to Oregon for the 1994 and 1995 tax years. The matter is before the court on stipulated facts and cross motions for summary judgment.

## I.  FACTS

Taxpayer was founded in 1963 with a sales force of nine consultants plus its cofounders; by 1994 taxpayer's sales force had grown to more than 325,000 consultants. Taxpayer uses the direct sales method to market its line of skin care

products, cosmetics, toiletries, and other personal care products. Independent Beauty Consultants (Consultants) purchase products directly from taxpayer and then make retail sales to their customers. Consultants are independent contractors and receive commissions from taxpayer based on the wholesale value of the products purchased from taxpayer. Commissions paid by taxpayer to Consultants, as well as the value of any prizes and awards, are reported to the IRS as independent contractor income on a Federal 1099 form. After meeting minimum qualifications, a Consultant becomes eligible to submit an application to become an Independent Sales Director (Director). Once accepted as a Director, commissions are based on the wholesale purchases of the Director's "unit." A unit includes the personal recruits of the Director, as well as the recruits of those personal recruits, and the recruits of their recruits.

To motivate product sales by Consultants and Directors, taxpayer has developed various incentive programs. Those incentives follow the progression of the "Mary Kay Consultant Career Path." The Mary Kay Consultant Career Path includes six steps: (1) Beauty Consultant; (2) Star Recruiter; (3) Team Leader; (4) Team Manager, Silver and Gold Key Team Managers; (5) Director-in-Qualification; and (6) Director. An example of the incentive to achieve the level of Star Recruiter is eligibility "to wear the beautiful red jacket with a black skirt" which the Consultant then continues to wear at "each step of the Consultant Career Path." When the level of Team Manager is achieved, the Consultant is eligible to participate in the Career Car Program.

Once the necessary criteria have been achieved, a Consultant[1] may qualify for the Career Car Program through which the Consultant may use a Career Car leased from a third-party lessor. The entire lease payment is reported on the Consultant's form 1099 as a commission; however, the lease payment is paid directly by taxpayer to the leasing company, which, for the years at issue, was Automotive Rentals, Inc. (ARI). If the Consultant fails to meet the production

---

[1] Consultant is used for ease of reference to refer to any Mary Kay Independent Beauty Consultant or Director that has qualified for participation in the Mary Kay Career Car Program.

standards for participation in the Career Car Program, the Consultant must make an out-of-pocket copayment of all or a portion of the lease payment for the Career Car. If a qualifying Consultant chooses not to participate in the Career Car Program, an additional cash commission is paid by taxpayer directly to the Consultant.

Taxpayer establishes all of the eligibility criteria for participation in the Career Car Program, including initial and ongoing production standards. Those criteria include a requirement that Consultants maintain automobile insurance that is provided through taxpayer's insurance program. A Consultant who becomes ineligible for taxpayer's insurance program is no longer eligible to use a Career Car.

The Career Car Program is structured around three agreements. First, to facilitate the Career Car Program, taxpayer negotiated favorable lease terms by entering into a Guaranty and Administration Agreement (Guaranty Agreement) with ARI. Other terms of the Guaranty Agreement include: a representation by taxpayer to ARI that the Career Cars are leased and used for business purposes; an agreement by taxpayer to pay additional mileage fees; and an agreement that upon return and sale of the leased vehicle the sale price is compared with book value (original capitalized cost less depreciation) and taxpayer either receives the benefit if the sale was above book value or pays the loss if the sale was below book value. *See* Appendix A ¶¶ 7(D), (E).

The second agreement is the Career Car Program Agreement (Program Agreement) between taxpayer and participating Consultants. By signing the Program Agreement, the Consultant agrees and assumes all obligations of the Program Agreement and the ARI Lease Agreement. *See* Appendix C at ¶ 1. Further, the Consultant takes the Career Car subject to the terms of the "Mary Kay Career Car Program" and the "Mary Kay Automobile Insurance Program," which are attached to the Program Agreement. *See* Appendix C at ¶ 2. Taxpayer reserves the right under the Program Agreement to amend or alter the terms and conditions of the Insurance and Career Car Programs, including the amount of lease copayments. *See id.*

The third agreement is the ARI Lease Agreement (ARI Agreement) between ARI and participating Consultants. Under the terms of the Guaranty Agreement, taxpayer obtains the Consultant's signature on the ARI Agreement and taxpayer guarantees the Consultant's payment and performance thereunder. *See* Appendix A at ¶ 1. Notably, the ARI Agreement refers to **vehicles**, plural, leased under the agreement. For example, as to delivery and acceptance, "ARI agrees to deliver such vehicles to Lessee, subject to ARI's ability to obtain sufficient vehicles of the type ordered." *See* Appendix B at ¶ 2a. If a Consultant leaves taxpayer or is no longer eligible for the Career Car Program prior to the end of the lease term, the Consultant must either surrender the Career Car and be under no further obligation to taxpayer or ARI, or purchase the Career Car directly from ARI.

## II. ISSUE

Were Career Cars leased in conjunction with taxpayer's Career Car Program properly included in the property factor for purposes of calculating taxpayer's apportionable income?

## III. ANALYSIS

■   Corporations with business operations within and without Oregon must apportion their income based upon their business activities within Oregon. ORS 314.615.[2] Oregon has, with some alterations, adopted the Uniform Division of Income for Tax Purposes Act (UDITPA) setting forth the three-factor formulary apportionment based on property, payroll, and sales. *See* ORS 314.605 to 314.675.

■   The formula for apportionment of business income is set forth in ORS 314.650, which provides, in relevant part:

"(1)   All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus two times the sales factor, and the denominator of which is four.

---

[2] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 1993.

"(2)   If the denominator of the property factor, payroll factor or sales factor * * * is zero, then the denominator specified in subsection (1) of this section shall be reduced by the number of factors with a denominator of zero."

The calculation of the property factor is set forth in ORS 314.655(1):

"The property factor is a fraction, the numerator of which is the average value of the taxpayer's * * * **tangible personal property owned or rented and used in this state during the tax period** and the denominator of which is the average value of all the taxpayer's * * * tangible personal property owned or rented and used during the tax period."

(Emphasis added.)

Pursuant to the statutes, the amount of taxpayer's income apportionable to Oregon is increased if the Career Cars are included in taxpayer's property factor. However, taxpayer argues that it does not rent and use the Career Cars as required by ORS 314.655(1); therefore, taxpayer asserts that the Career Cars should not be included in its property factor, the numerator of the property factor should be reduced to zero, and taxpayer's overall liability reduced accordingly. The department argues that although the form of the ARI Agreement purports to be a lease between ARI and the Consultants, in substance taxpayer controls every material aspect of the transactions through the Guaranty Agreement and the Program Agreement. Therefore, the department asserts that for purposes of ORS 314.655(1) the Career Cars are properly included in taxpayer's property factor.

■     To find that the Career Cars, leased as part of taxpayer's Career Car Program, were properly included in taxpayer's property factor, the court must determine whether the Career Cars were "rented and used" by taxpayer during the period at issue. In order to determine whether taxpayer "rented and used" the Career Cars leased in conjunction with taxpayer's Career Car Program, the court will evaluate the rights and obligations of taxpayer and Consultants with respect to the Career Cars leased for use in taxpayer's Career Car Program. In evaluating those rights and obligations, the

court will look to both the form and substance of the transaction, following the rule that:

> "taxes are to be based on the 'objective economic realities of a transaction rather than * * * the particular form the parties employed.' "

*Baisch v. Dept. of Rev.*, 316 Or 203, 210, 850 P2d 1109 (1993), *citing Frank Lyon Co. v. United States*, 435 US 561, 573, 98 S Ct 1291, 55 L Ed 2d 550 (1978).

A.  *Objective Economic Reality: Lease to Consultant or Lease to Taxpayer?*

■        The court's consideration and analysis of the objective economic reality will focus on whether taxpayer's Career Car Program should be treated as:

(1)   A lease of the Career Cars from ARI to the Consultants with a guaranty by taxpayer—the transaction that taxpayer argues is reflected in the forms employed by the parties; or, alternatively,

(2)   A lease of the Career Cars from ARI to taxpayer with taxpayer then granting the Consultants use of the Career Cars as a form of incentive—the position of the department.

In this "substance or form" analysis, the court will consider three elements:

(1)   The documents of the transaction;

(2)   The actions or statements of the parties to the transaction among themselves; and

(3)   The actions or statements of one or more of the parties to third parties regarding the transaction.

Because the parties' actions among themselves are a result of the documents of the transaction, the court will consider those two elements together.

The ultimate resolution of whether substance and form are consistent or whether substance differs from form will depend on whether the above-listed elements are consistent with the form of the transaction or, instead, a different substantive reality.

1. *Documents of the Transaction and Actions or Statements Among the Parties*

Transaction documents produced by parties not in a position of economic or tax adversity will in many, if not most, cases support an argument that the form of the transaction is also its substance. In this case, taxpayer points to the ARI Agreement and argues that the form of that agreement, which purports to be a lease agreement between ARI and the Consultants, should govern the inquiry. In further support of this position taxpayer argues that the Guaranty Agreement is just that, and its only role in the vehicle lease between ARI and the Consultants is that of a guarantor of the Consultants' obligations under the ARI Agreement. In order to determine whether the substance and form are consistent, however, all three of the agreements—the ARI Agreement, the Guaranty Agreement, and the Program Agreement—must be considered together. Those three agreements define the entire set of relationships and individual agreements often refer to or are linked to the terms of other agreements. For example, in section one of the Program Agreement, the Consultants assume all obligations of the Program Agreement and the ARI Agreement; likewise, in section one of the Guaranty Agreement, taxpayer is bound by all terms of the ARI Agreement.

The most decisive exercise in analyzing the relationship created by the agreements is to compare the ARI Agreement with the Guaranty Agreement. ARI is a party to each agreement and the basic issue in this case is which of the agreements is primary.

In a number of respects, those agreements are inconsistent. For example, the terms of the ARI Agreement obligate ARI to make a payment to the Lessee, defined in that agreement as the Consultants, at termination of the lease. The Guaranty Agreement directly conflicts with the ARI Agreement by requiring the same termination payment be made to taxpayer. *Compare* Appendix A at ¶ 17D *with* Appendix B at ¶ 10B. However, this conflict is resolved by a provision of the Guaranty Agreement that states that the Guaranty Agreement controls over any exhibits to that agreement. *See* Appendix A at ¶ 10M. Because the ARI Agreement is such an exhibit, and because, on this critical

term, taxpayer acknowledged at oral argument that taxpayer and ARI follow the Guaranty Agreement, the court will resolve any conflicts between the two agreements by giving the Guaranty Agreement a controlling position.

Comparing the ARI Agreement side-by-side with the Guaranty Agreement, it is noteworthy that in most, if not all, respects the Guaranty Agreement mimics the ARI Agreement. The Guaranty Agreement contains specific provisions usually found in a lease but not in a guaranty. The primary importance of the Guaranty Agreement can be seen in a discussion of the major terms of the documents.

### a. The Parties/Creation of Obligations

Based on the documents, it appears ARI very likely neither meets nor sees the Consultants. Instead, pursuant to the Guaranty Agreement, taxpayer mediates the entire relationship. Taxpayer, "on behalf of" ARI, procures the signature of the Consultants on the requisite forms and then makes payments of rent due from the Consultants "on behalf of" the Consultants. *See* Appendix A at ¶¶ 1, 2A. Those facts, although not dispositive, provide an indication that taxpayer has more of a role than just a guarantor. Taxpayer stands **between** ARI and each Consultant and not just **behind** the Consultant.

The Guaranty Agreement also provides that taxpayer has the ability to change the lessor under the ARI Agreement by nominating another company to fulfill that role. *See* Appendix A at ¶ 2F. In addition, taxpayer can, at its option, purchase from ARI the vehicles subject to the ARI Agreement with the Consultants. *Id.* The rights granted to taxpayer under the Guaranty Agreement to alter the parties to the ARI Agreement are inconsistent with the conclusion advocated by taxpayer: that taxpayer is merely a guarantor of a Consultant's obligations under the ARI Agreement.

Under the terms of Guaranty Agreement, the fundamental obligation to ARI is the result of taxpayer's actions. Although taxpayer undertakes to obtain a signed ARI Agreement from each Consultant, the Guaranty Agreement states:

"Execution by Mary Kay of a Mary Kay order letter(s) **shall create an obligation** on the part of the **Lessee** to accept

said vehicles(s) for lease by its Independent Sales Director(s)."

Appendix A at ¶ 10B (emphasis added). The term "Lessee," is not defined in the Guaranty Agreement. However, in context, that provision seems to plainly contemplate that the "Lessee" is taxpayer. Not only is taxpayer the only party to the Guaranty Agreement other than ARI, but the phrase "its Independent Sales Directors" clearly refers to taxpayer's Consultants. Logically, the reference to a "Lessee" is not a reference to a Consultant. The provision quoted above makes clear that the lease obligation is created by taxpayer's order and not by any undertakings of the Consultants.

The use of the term "Lessee" to refer to taxpayer is not the only place that what could be called a legal "Freudian slip" is made in the Guaranty Agreement. The Guaranty Agreement provides that if taxpayer fails to provide insurance coverage, "ARI may immediately terminate the 'Lease Agreement.'" Appendix A at ¶ 4C. Subsequent amendments to the Guaranty Agreement designate taxpayer as "Lessee." *See, e.g.,* Appendix A at Amendment to Guaranty and Administration Agreement dated January 20, 1988. Consideration of the context of those various uses of the term "Lessee" indicates a struggle on the part of the drafters to provide for a lease by some other name—a Guaranty and Administration Agreement. Although form may not govern, confusion in forms cannot be ignored.

### b. Rental Payments

#### (1) Rental Obligations Defined

The ARI Agreement states that monthly rental is to be paid to ARI by the Consultants and specifies time requirements and rules for the payment. However, under the Guaranty Agreement, taxpayer agrees to pay rental charges "on behalf" of the Consultants. *See* Appendix A at ¶ 2A. But in the Guaranty Agreement, and only there, the essential details of the rental charge are specified by use of an exhibit. *See* Appendix A Exhibit "C" to Guaranty and Administration Agreement. In that exhibit, critical economic details, such as the vehicle capitalization formula, management fee, depreciation charges, and, perhaps most importantly, the implicit

interest rate on the lease, are set out **for agreement or choice by taxpayer, not the Consultants**. Further, those terms may be changed by agreement of taxpayer and ARI without participation of the Consultants.

The foregoing facts are inconsistent with taxpayer's argument that it is merely a guarantor of the obligation of a Consultant arising from a contractual arrangement between a Consultant and ARI. The law of suretyship addresses the extent to which alteration of an obligation by a debtor and creditor affects the liability of the surety (guarantor). *Restatement (Third) of Suretyship and Guaranty* § 41 (1996).[3] Under the agreements involved here, however, the putative guarantor (taxpayer) has the power to unilaterally choose critical components that **define** the underlying obligation, such as the interest rate to be used in calculating rent. The putative guarantor also has the ability to change the terms of the underlying obligations through agreement with the creditor (ARI), without the consent of the putative lessee/debtor (Consultants). Each of these facts is a strong indication that, in substance, the putative guarantor is, in fact, the principal obligor.

The nature and satisfaction of payment obligations under the terms of the documents and in practice are also indicators of taxpayer's role as principal obligor rather than guarantor. Actual payment to ARI comes from taxpayer and not the Consultants. More importantly, the payment obligation is fully recourse to taxpayer.[4] However, the payment obligation is not, in practice, recourse to each Consultant.

---

[3] "Whenever the principal obligor and the obligee agree to a modification of the underlying obligation, it is necessary to determine the effect of that modification on the corresponding duties of the principal obligor to the secondary obligor and on the duties of the secondary obligor to the obligee pursuant to the secondary obligation."

*Restatement* at § 41 comment a.

[4] The Guaranty Agreement provides: "Mary Kay further agrees to guaranty payment and performance by the Independent Sales Director(s) under the Lease by a separate guaranty attached hereto and marked Exhibit 'B.' " *See* Appendix A ¶ 1. That exhibit provides: "In order to induce ARI to enter into such Leases, and in consideration thereof, **Mary Kay hereby guarantees as primary obligor and indemnitor** without ARI first having to proceed against Mary Kay Independent Sales Director(s)." (Emphasis added.)

Notwithstanding the formal obligation of each Consultant to pay rent to ARI, a Consultant can walk away from or become disqualified from the Career Car Program and have no personal liability to ARI.[5]

>    (2)    Recourse and Nonrecourse Nature of Various Obligations

The nonrecourse obligation of each participating Consultant should also be compared to the recourse obligation that exists between taxpayer and each participating Consultant. If a Consultant qualifies for the Career Car Program, taxpayer makes the full rental payment due to ARI and reports the payment as an additional commission to the Consultant. If a Consultant falls below the required production level, taxpayer continues to make the full rental payment to ARI and requires a copayment from the Consultant to taxpayer. In such situations, taxpayer may offset any copayment amount due against any commissions due from taxpayer to the Consultant. If the offset is insufficient, the Consultant has a personal obligation to pay taxpayer any amount due.[6]

---

[5] The parties stipulation paragraph 27 provides:

"Independent Consultants who elect to use a Career Car leased through the Career Car Program are required to continue to meet certain production requirements or to make all or a portion of the ARI lease payment. If the Independent Consultant fails to meet production requirements and fails to make any needed co-payment, then the Independent Consultant is no longer eligible to participate in the Career Car Program and is required to surrender the Career Car to ARI or to purchase it directly from ARI. **If an Independent Consultant surrenders the Career Car prior to the completion of the lease term, the Independent Consultant is generally under no further obligation to Mary Kay or ARI regarding the Career Car.**"

(Emphasis added.)

[6] The parties Stipulated Facts, Exhibit I, is material titled "Mary Kay Career Car Program." That exhibit details specific participation requirements of the Career Car Program. Page three of the exhibit discusses co-op lease payments:

"If the performance account is depleted and production falls below the required [amount], a co-op lease payment will be calculated and deducted from the next month's commission check. If the next month's earnings are not sufficient to cover the amount of the co-op payments, the car driver will need to remit the balance to [Mary Kay]. The [Consultant] will be allowed to make co-op lease payments as long as she is current on any monies due [Mary Kay] (no balance receivable), has five or more active personal team members, and there is steady improvement in monthly team production or toward the required $4,000 per month."

Taxpayer argues that the substance of the transaction at issue is a direct lease from ARI to the Consultants with taxpayer being only a guarantor. However, the nonrecourse relationship between each Consultant and ARI stands in stark contrast with the fact that taxpayer has a fully recourse obligation to ARI under the agreements. Indeed, that obligation is described in the controlling document—the Guaranty Agreement—as **primary**.[7] The fact that the ARI-Consultant relationship is nonrecourse is inconsistent with taxpayer's argument, especially considering taxpayer has a **recourse** obligation to ARI and a **recourse** right to collect from Consultants.[8]

This constellation of recourse and nonrecourse relationships strongly suggests that taxpayer is the lessee from ARI and then makes the use of cars available to the Consultants through a sublease or license. No recourse relationship exists between the Consultants and ARI. Instead, through the Guaranty Agreement taxpayer creates a recourse relationship between itself and ARI. Taxpayer also creates a related recourse relationship between itself and the Consultants through its Program Agreement. Notably absent is any recourse relationship between ARI and the Consultants. The structure of the recourse financial relationships strongly indicates the reality of relationships for tax purposes.

### c. Insurance

Although the ARI Agreement provides that the "lessee" will obtain insurance with a minimum single limit of $500,000 for personal injury and $100,000 for property damage, in the Guaranty Agreement taxpayer undertakes to provide "primary" insurance coverage with "minimum limits of $1,000,000 combined single limits per occurrence * * *."

---

[7] *See* footnote 4.

[8] It is also important to note that although a Consultant may incur obligations to taxpayer under the copayment features of the Career Car Program, there is no indication in the record that taxpayer ever has asserted against any Consultant those rights of ARI to which it would presumably be subrogated in the event it paid obligations under its guaranty. *Restatement (Third) of Suretyship and Guaranty* §§ 27, 28 (1996).

Appendix A at ¶ 4A. ARI and taxpayer have agreed that taxpayer may satisfy the insurance requirements through "self-insurance" by taxpayer. Those provisions indicate taxpayer is acting as much more than merely a guarantor and that ARI's focus is on taxpayer and not on the Consultants.

Pursuant to the terms of the ARI Agreement, each Consultant agrees to obtain insurance. However, under the Program Agreement between the Consultants and taxpayer, that insurance **must** be obtained pursuant to taxpayer's insurance program and continued eligibility under that program is a condition to continued participation in the Career Car Program. Appendix C at ¶ 2. Insurance eligibility depends upon avoiding accidents and other behaviors, which, under a detailed system, cause "points" to accumulate against a Consultant. A Consultant's point total, together with other characteristics personal to the Consultant, can cause insurance fees to vary.

For example, if a Consultant accumulates 12 or more points, significant consequences ensue: consequences that speak to the substance of the relationships.

> "Any car qualifier whose rating reaches or exceeds 12 points or more will have the option of purchasing the car directly from the leasing company, returning the car, **or leasing the car on an individual basis directly from the leasing company** (subject to the leasing company's acceptance.) **If the car is** purchased or **leased**, it then becomes the responsibility of the car qualifier to purchase her own automobile insurance."

(Emphasis added.)

A number of observations are relevant here. To begin with, the ARI Agreement does not include the "option" to purchase discussed in the quote above. Based on statements made at the oral argument on this matter, it appears this "option" is not binding on ARI, but is merely a statement that if the Consultant so chooses, she may try to make such a purchase from ARI. Therefore, the "option" is merely a description of a course of action a Consultant might choose to undertake rather than a right that Consultant could exercise.

Additionally, the consequences of returning a Career Car in the event of insurance difficulty illustrate the fact that the "obligations" of the Consultants under the ARI Agreement may be avoided entirely, **even on the basis of behavioral problems of a Consultant**. In the event a Consultant is disqualified from taxpayer's insurance program and therefore has to return the Career Car, the Consultant has no further obligation to ARI. It is remarkable that what is, in essence, a **breach** of the putative lease by the Consultant leads to **discharge** of the Consultant's obligations. However, taxpayer's obligations to ARI are unaffected by such action of the Consultant. That fact indicates the gravitational field in the relationship is between taxpayer and ARI and not between ARI and the Consultant.

Finally, it is noteworthy that the language quoted above assumes that the Consultant is not **already** "leasing the [Career Car] on an individual basis from the leasing company." Taxpayer's description of the Consultant's options with respect to the Career Car upon insurance disqualification is inconsistent with its position that the ARI Agreement is to be respected for tax purposes. If the Consultant was already leasing the Career Car, it would be nonsensical to provide that such a relationship could be created **after** insurance disqualification. If the form of the ARI Agreement—a lease from ARI to the Consultant—reflects economic reality, why would a later "individual" lease between the Consultant and the "leasing company" be contemplated in the event of insurance disqualification? If the ARI Agreement is substantive for tax purposes why is it not, even before disqualification from the Career Car Program, a "direct" lease under which the Consultants could obtain their own insurance from another source? Those questions and the facts on which they are based demonstrate that even taxpayer did not respect its chosen form.

d.   Return of Vehicles/Termination Economics

Upon termination of the lease relationship with ARI, a final and important economic calculation is made. The calculation creates an obligation or a benefit for the "lessee" from ARI. Although the forms employed describe the Consultant as the "lessee" under the ARI Agreement, the only

parties interested in the termination calculation are **taxpayer** and ARI; participating Consultants are not involved or interested in that calculation. Returned Career Cars are sold and the sales price, after subtraction of the depreciated book value of the vehicle, results in either a payment to taxpayer (if sales price exceeds book value) or ARI (if sales price is less than book value). Appendix A at ¶ 7C. The liability or benefit of those calculations **accrues to taxpayer not the Consultant**.

A further indication that taxpayer is the true "lessee" from ARI is found in the methodology for calculation of the termination amounts. The calculations of amounts due to or from taxpayer or ARI are not made as to each vehicle leased under an ARI Agreement. Rather the calculations are made on a year-to-date cumulative basis **for all Career Cars in taxpayer's Career Car Program**. *Id.* at ¶ 7D. Further, the payment due to or from taxpayer is also affected by **aggregate** excess mileage charges for **all** Career Cars leased by ARI into the Career Car Program. *Id.* at ¶ 7E. Taxpayer, not each participating Consultant, is responsible for excess mileage charges. *See id.; see also* Appendix C at ¶ 14. Taxpayer is entitled as such to the benefits or burdens, **in the aggregate**, of resale and excess mileage. Only taxpayer, not individual Consultants, has interest in aggregate computations. Economically, taxpayer stands **between** ARI and all of the Consultants rather than **behind** each Consultant.

The absence of a focus on individual Consultant/ARI matters is also found in the tax reporting done by taxpayer. When reporting to the IRS the value of Career Car Program participation for each Consultant, apparently no account is taken of whether any given Consultant had to surrender a termination payment otherwise due to her or had her termination liability or excess mileage charge assumed and paid by taxpayer. The information returns provided to the IRS reflect only the rental value of the Career Cars while used and a limited number of other payments made by taxpayer. They do not reflect any receipt or payment of termination amounts by the Consultant. If each Consultant "lease" was important for tax purposes, presumably the forms 1099 would be increased in cases where taxpayer made a termination payment to ARI on behalf of the Consultant and vice

versa. The absence of such accounting in the reports is yet another indication that the financial results of the ARI Agreement are not the concern of the Consultants, but only of taxpayer.

■ Taxpayer argues that it takes the benefit of resale to help defray the costs of maintaining the Career Car Program. Such an argument does not explain why taxpayer would agree to suffer the economic detriments that may or do occur in the resale and mileage calculations. When taxpayer stands between ARI and the Consultants and intercepts a significant set of benefits and burdens of the lessee's position, it cannot persuasively argue that, in substance, it remains merely a guarantor and not a lessee-sublessor or lessee-sublicensor. The substance of the transaction appears to be a lease from ARI to taxpayer with taxpayer then providing the use of Career Cars to the Consultants as an incentive.

e.  Credit Provisions and Concerns

One of the most troubling facts about taxpayer's characterization of the relationship created by the agreements is that neither ARI, the putative creditor, nor taxpayer, the putative guarantor, appear concerned about the creditworthiness of the Consultants, the putative lessees. ARI's lack of concern with the credit of any Consultant is evidenced by the fact that the ARI Agreement requires no financial information from the Consultants. In contrast, ARI negotiated for the right to receive unqualified audited financial statements of taxpayer and notice of any change in ownership or control of taxpayer. Appendix A at ¶ 10K. In comparing ARI's evident concern about the credit of taxpayer (the putative guarantor) with its utter lack of concern for the credit of the Consultants (the putative lessees), it is hard to avoid the conclusion that ARI was, in economic substance, dealing directly with taxpayer and not with each Consultant. *See Plantation Patterns, Inc. v. Comm'r of Internal Revenue*, 462 F 2d 712, 724 (1972) (finding that where, in substance, the creditor looked to the guarantor as the primary obligor, the guarantor is treated as primary obligor).

Although ARI's lack of concern with the credit of the Consultants is of some concern, it could be explained by the fact that taxpayer's superior credit status renders that of the

Consultant largely irrelevant to ARI. However, taxpayer never appears to concern itself with the credit status of each Consultant. Taxpayer's lack of concern with the credit of the Consultants is decidedly inconsistent with taxpayer's proposed view of the transactions. In theory, if taxpayer agreed to guarantee obligations of the Consultants, it would have wanted some credit information about each Consultant. Nothing in the record indicates taxpayer ever requested or received such information.

Such disregard is understandable insofar as taxpayer apparently decided to take a categorical risk with all of its Consultants. However, taxpayer also appears to have ignored the individual credit status of each Consultant in reporting the value of the transaction to the IRS and any element of value attributable to its guaranty in favor of the Consultant.

It is extremely unlikely that all Consultants would have equal creditworthiness. Taking unequal creditworthiness as a given, if taxpayer was in fact a guarantor for each Consultant, the value of taxpayer's guarantee to a Consultant with good credit would be less than the value of the same guarantee to a Consultant with poor credit. However, in reporting to the IRS the value of the Career Car Program to Consultants, no compensatory element attributable to the value of the guaranty is acknowledged. More importantly, no distinction is made, other things such as Career Car choice being equal, between a Consultant with superior credit and a Consultant with inferior credit. The components of the report to the IRS are limited to the amount of the monthly lease payments paid by taxpayer and the cost of insurance, miscellaneous taxes, title, and registration fees paid.

Here again, the facts are inconsistent with taxpayer's theory that it stands as a guarantor to each individual lease between a participating Consultant and ARI. If that were the role of taxpayer with respect to all Career Cars leased from ARI, a different value would be reported on the form 1099 for a Consultant where that Consultant's credit was different from other participating Consultants. The absence of that feature points to the role of taxpayer not as guarantor, but rather as lessee from ARI and provider of an

incentive to the Consultants. The incentive elements through payment of the individual lease costs of each Consultant (type of car chosen, title, insurance, mileage used, etc.) are reflected in reports to the IRS. If taxpayer is the lessee and not a guarantor, there is no need for the forms 1099 to reflect a variable guaranty fee.

Taxpayer's lack of concern about both the personal creditworthiness of Consultants and the relative **credit risks** of participating Consultants is to be contrasted with the fact that taxpayer is clearly concerned about the relative **tort risk** presented by each Consultant. Taxpayer's insurance program, in which all Consultants participating in the Career Car Program must enroll, includes detailed distinctions based on driving history and other personal factors for each Consultant.

Taxpayer is obviously able and, at times, willing to demand from each Consultant specific risk-related information. Taxpayer does so in the instance where it stands as an **insurer of the tort risks** presented by different Consultants. Although taxpayer claims to be an insurer of credit risks of the different Consultants, taxpayer does not independently analyze such risks. Taxpayer does not make any distinction in its behavior, in the economic terms of the Career Car Program, or in its reports to the IRS based on the differences in credit risk of individual Consultants. Taxpayer's actions and omissions as to the two types of risk strongly indicate that it is not, in economic reality, a guarantor or insurer of risk inherent in a primary obligation incurred by each Consultant under the ARI Agreement.

2. *Actions and Statements to Third Parties*

a. Representation to IRS

When the Guaranty Agreement was executed, taxpayer also executed, and apparently provided to ARI and the IRS, a Terminal Rental Adjustment Clause (TRAC) Certification.[9] That TRAC Certification was provided under IRC

---

[9] For purposes of the Internal Revenue Code, the term "terminal rental adjustment clause" means "a provision of an agreement which requires the rental price to be adjusted upward or downward by reference to the amount realized by the lessor under the agreement upon sale or other disposition of such property." IRC § 7701(h)(3).

section 168(f)(13)[10] and had the effect of confirming that ARI would be treated as the owner of all automobiles for federal income tax purposes, notwithstanding the presence in the agreements of a terminal rental adjustment clause. TRAC Certification resolved doubt that might otherwise exist about whether each "lease" was to be treated as a lease or a conditional sale for federal income tax purposes.

On the question of characterization of a transaction as a lease or a sale, Oregon followed federal tax law in the years at issue. *See* ORS 314.011. Therefore, for Oregon as well as federal purposes, each Career Car transaction must be treated as a lease and not a conditional sale. In this case, the status of the transaction as a lease as opposed to a sale is not in question. Rather, the status of a lease is clear and the question is who is to be treated as the lessee.

For federal tax purposes, the TRAC Certificate must be signed by the **lessee** of property, under penalties of perjury. IRC § 168(f)(13). Taxpayer signed the TRAC Certificate. Under federal law, a lessor may not rely on a TRAC Certificate known to be false. Absent the TRAC Certificate, the lessee, rather than the lessor, could be treated as the owner of property for tax purposes and therefore entitled to tax depreciation allowances.

In this case, taxpayer represents on the TRAC Certificate that it is the lessee and that the leased automobiles were used in taxpayer's trade or business. Taxpayer asserted at oral argument that the TRAC Certificate is not of great importance because it was for the benefit of ARI. However, the TRAC Certificate fixed the transaction as a lease for tax purposes. That status ensured that ARI would enjoy the benefit of the depreciation allowances provided under federal and state tax law. Taxpayer also benefits from that status because the value of depreciation allowances would presumably reduce the rental charges that taxpayer would otherwise have had to pay.

■　　Although it is not clear from this record what all the consequences of treating taxpayer as owner would have been,

---

[10] The comparable provisions in current law are found in the Internal Revenue Code section 7701(h).

it is clear that neither taxpayer nor ARI wanted or bargained for that result. Certainty about the status of ARI as owner and taxpayer as lessee under **state** and federal law was achieved and confirmed by the TRAC Certificate. Having represented to the federal and state taxing authorities through the TRAC Certificate that it is the lessee of the automobiles leased from ARI, taxpayer may not abandon that representation in this circumstance and assert that it is only a guarantor of a "lease" between ARI and each participating Consultant.

### b.  Web Representations

On its website, taxpayer describes its business and the opportunities available to Consultants. In that very public place, taxpayer refers to its "legendary car program." Appendix D. Career Cars, valued, in the aggregate, at over $150 million are described as "[T]he Mary Kay Fleet." *Id.* That possessive description is not mere puffery, it accurately reflects the economic reality: the fleet is first leased by taxpayer and use of a particular Career Car is provided by taxpayer to individual Consultants as part of taxpayer's incentive program.

### 3.  *Objective Economic Reality: Lease to Taxpayer*

After reviewing the documents of the transaction, the actions or statements among the parties, and actions or statements to third parties, the court concludes that the substance of the transaction differs from what taxpayer contends should prevail. In reality, taxpayer is the principal obligor and not simply a guarantor. As discussed above, the basic obligations are created by an order placed with ARI by taxpayer. Taxpayer thereby undertakes a recourse obligation to make the rental payments. However, no such recourse relationship exists between the Consultants and ARI. Likewise, the Consultants have no rights or interest with respect to termination of the lease. The benefits and burdens of the economics upon lease termination are aggregated and the liability or benefit of those calculations accrues to taxpayer. Rather than standing **behind** the Consultants as a true guarantor, taxpayer stands **between** the Consultants and ARI, making the Career Cars available as an incentive to qualifying Consultants. Finally, taxpayer's representations

to tax agencies and third parties by way of the TRAC Certificate and web page reflect taxpayer's role as lessee.

Based on the foregoing analysis, the court finds that the objective economic reality of the Career Car Program is a lease of automobiles from ARI to taxpayer with taxpayer then engaging in a sublease or license of the automobiles to Consultants.

B.  *Use of Career Cars in Oregon*

ORS 314.655(1) requires "use" of property in Oregon by taxpayer if tangible personal property is to be reflected in the Oregon property factor. The corresponding administrative rule provides that the use be in the regular course of the trade or business of the reporting taxpayer. *See* OAR 150-314.655(1)-(D).

With respect to use, taxpayer raises two points. First, although there is no question that some of the Career Cars are used in Oregon, taxpayer maintains that such use is only by the Consultants selling in Oregon and not its own use. Taxpayer argues that the Consultants direct the use of the Career Cars in Oregon and that, at most, it derives some indirect benefit from the Career Car Program. Second, taxpayer also raises the fact that the cost for the automobiles is reported by ARI in its Oregon property factor. The parties have stipulated that ARI includes in its Oregon property factor the cost for the automobiles in question. Such treatment only confirms the fact that an asset may be used by more than one person in a trade or business and direct physical possession of that asset is **not** required in connection with such "use."

Finally, the facts indicate taxpayer uses the Career Cars as a regular part of its trade or business. Taxpayer uses the cars by providing them as a key incentive in a business where taxpayer's income is dependent on the behavior of those who receive the incentives. The stipulated exhibits, especially the Career Car Program material **prepared by taxpayer**, are replete with descriptions of the value of Career Cars to the overall sales effort that benefits taxpayer as well as the Consultants. The Career Car Program is no

minor afterthought. Taxpayer's fleet is valued at $150 million. *See* Appendix D. Taxpayer maintains a substantial administrative department to manage and administer the Career Car Program. Taxpayer incurs insurance risk in connection with the Career Car Program. Indeed, the close nexus between the Career Cars and taxpayer's business is reflected in the fact that use of a Career Car is lost if a Consultant ceases to be a representative of taxpayer. All of those facts support a conclusion that taxpayer uses the Career Cars in its business. Nor may taxpayer, in equity, deny such use. In the TRAC Certificate that taxpayer signed and delivered to ARI, taxpayer confirmed a federal and state income tax status for the cars when it represented that more than 50 percent of the **use** of the Career Cars **was to be in taxpayer's trade or business**. Even apart from the factual support for the court's conclusion on that element, the TRAC Certificate by its terms defines taxpayer's status as a user of the automobiles for purposes of ORS 314.655.[11]

## IV.  CONCLUSION

After evaluating the rights and obligations of taxpayer with respect to the Career Cars leased for use in taxpayer's Career Car Program, it is the conclusion of the court that in substance the Career Cars are leased from ARI to taxpayer with the taxpayer then granting the Consultants use of the Career Cars as a form of incentive. This conclusion is based on the court's analysis of three elements: (1) the documents of the transaction; (2) the actions or statements among the parties; and (3) the actions and statements to third parties. The documents and actions of the parties demonstrate taxpayer's primary role in creating, maintaining, and terminating the lease obligation to ARI. Additionally, taxpayer's representations to third parties, particularly the representations made to the IRS through the TRAC Certificate give further support to the court's conclusion that the Career Cars were properly included in taxpayer's property factor. Now, therefore,

---

[11] In its Complaint, taxpayer raised several objections based upon the Oregon Constitution and the United States Constitution. None of those points was briefed or argued by taxpayer and are not addressed.

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is denied, and

IT IS FURTHER ORDERED that Defendant's motion for summary judgment is granted. Costs to neither party.

# APPENDIX A
## EXCERPTS FROM STIPULATED EXHIBIT C—
## GUARANTY AND ADMINISTRATION AGREEMENT

"1.  Motor Vehicle Lease(s) and Guarantee

"Upon delivery of a vehicle to the Independent Sales Director(s), Mary Kay shall, on behalf of ARI, obtain from the Independent Sales Director(s) an executed Lease Agreement and Motor Vehicle Lease Agreement (hereinafter collectively referred to as the 'Lease') in the form attached hereto and marked Exhibit 'A' and such other addenda, amendments or agreements as ARI and Mary Kay may require and return all such executed documents to ARI. Upon delivery of a vehicle to the Independent Sales Director(s) Mary Kay assumes all obligations herein agreed to be performed by Mary Kay. Mary Kay further agrees to guarantee payment and performance by the Independent Sales Director(s) under the Lease by a separate guaranty attached hereto and marked Exhibit 'B'. Upon the ordering of a vehicle from the manufacturer, ARI assumes all obligations under this Agreement and the Lease.

"Mary Kay shall be subject and bound by all covenants, agreements, disclaimers, waivers, and releases contained in the Lease or made in connection.

"2.  Payments

"A.  Lease Charges - Mary Kay agrees to pay ARI, on the Independent Sales Director(s') behalf, the monthly lease charges plus applicable sales taxes from the date of delivery in accordance with Exhibit 'C' together with all other charges payable in conjunction with such other addenda or agreements as may be executed by the parties.

"* * * * *

"F.  During the term of this Agreement, Mary Kay may transfer all or part of the vehicles leased hereunder to another leasing company or purchase or arrange for the purchase of the vehicles leased hereunder at their then depreciated value by giving thirty (30) days prior written notice to ARI.

"* * * * *

"3.  Use of Vehicle(s)

"A.   Mary Kay represents to ARI that the vehicles are leased by the Independent Sales Director(s) primarily for business and commercial purposes in the United States and its territories.

"* * * * *

"4.   Insurance and Indemnification

"A.   Liability, Collision, and Comprehensive - During the term of this Agreement and in connection with the use and operation of vehicles leased hereunder, Mary Kay agrees to provide and maintain standard comprehensive Automobile Liability Insurance, which coverage shall be primary, protecting ARI against any and all liability, with minimum limits of $1,000,000 combined single limits per occurrence or the equivalent satisfactory to ARI, and Automobile Comprehensive and Collision Insurance, in amounts satisfactory to ARI, covering loss from fire, theft, windstorm; and other comprehensive hazards, as well as collision protection.

"* * * * *

"C.   Failure to Provide and Maintain Insurance - If Mary Kay fails to provide and maintain insurance coverages as referred to in this Paragraph 4, or fails to furnish ARI with required evidence of such insurance coverages, ARI may immediately terminate this Lease Agreement or ARI may obtain such required insurance on behalf of Mary Kay, and Mary Kay agrees to pay ARI for such insurance.

"* * * * *

"7.   Return of Vehicles

"* * * * *

"C.   Upon the sale of a returned vehicle, as provided in Paragraph 7B, a depreciation adjustment will be calculated by ARI. If the net sale price is greater than the depreciated Book Value, a depreciation credit plus applicable sales tax credit will be issued to Mary Kay. If the net sale price is less than the depreciated Book Value, a depreciation charge plus applicable sales tax charge will be issued to Mary Kay.

"Net sale Price is defined as the net proceeds realized by ARI after deducting all costs and expenses incurred in connection with the sale. Book Value is defined as the original capitalized cost of the vehicle as adjusted in accordance

with the formula set forth in Exhibit 'C' for the number of months the vehicle was in service. The account of Mary Kay will not be credited for net gain realized plus a sales tax credit over amounts owed ARI by Mary Kay if at the time of the issuance of credit Mary Kay is in default of payments required or in the performance of this agreement.

"D.   ARI shall pay to Mary Kay, as a rental adjustment on automobiles 100% of any excess of the net resale proceeds over the depreciated value of the vehicle. If the net resale proceeds are less than the depreciated value of the vehicle, Mary Kay shall pay to ARI as rental adjustment the amount of such deficiency, provided that ARI shall guarantee to Mary Kay minimum net resale proceeds equal to 20% of the Capitalized Value at the beginning of the initial lease term. If Mary Kay elects to extend beyond the minimum lease period, ARI shall guarantee 25% of the fair value of the vehicle at the inception of the concluding month's extension period. 'Fair Value' shall be defined as 85% of resale value for automobiles as reported by Automotive Market Report published by Automotive Auction Publishing, Inc., or its successor publications or publishers as of the publication date immediately preceding the last day of the month which immediately precedes the month in which termination as to the particular vehicle occurs.

"Settlements of excess or deficiency from resale as described above, shall be based on calendar year-to-date sales. Tentative settlements will be made monthly, but adjusted quarterly to reflect year-to-date results. For this purpose a quarter is defined as a three (3) month period ending March 31, June 30, September 30 and December 31.

"E.   As to automobiles, a charge for excess milage of 2 ½¢ per excess mile, based on the following schedule shall apply, provided however, that same shall not exceed the aggregate amount of any guarantee required to be made up by ARI on resales during any full calendar year, as described in Article 7D.

"1)   Any excess over 1,650 miles per month of usage during the first twenty-four (24) months of service; plus

"2)   Any excess over 850 miles per month of service thereafter. Such excess milage charge shall be incorporated into the calculation of the 'Settlements of excess or deficiency from resale' provided for in this article at the times therein provided for same to occur.

118

"\* \* \* \* \*

"10.   General

"\* \* \* \* \*

"B.   This Agreement, duly executed by Mary Kay order letter(s), addenda, amendments, and other agreements attached hereto constitute the entire agreement between the parties and may be modified only in writing duly executed by both parties. Execution by Mary Kay of a Mary Kay order letter(s) shall create an obligation on the part of Lessee to accept said vehicle(s) for lease by its Independent Sales Director(s).

"\* \* \* \* \*

"K.   Mary Kay shall furnish ARI unqualified audited financial statements prepared and certified by an independent certified public accounting firm after the end of each fiscal year. Such statements to be supplied as soon as available but no later than 120 days after the end of a fiscal years [sic]. Mary Kay shall notify ARI, in writing, of any change in name, ownership or control of Mary Kay. Such notification to be supplied to ARI within thirty (30) days of such change.

"\* \* \* \* \*

"M.   This Agreement and all Exhibits hereto shall represent the entire agreement of the parties, and supercedes any prior agreements, written or oral. In the event of a conflict between the terms of this Agreement and any of the Exhibits thereto, the term of the Agreement shall be controlling.

"IN WITNESS WHEREOF, the parties hereto have cause these presents to be executed by their authorized representatives this 10 day of July, 1987."

EXHIBIT C
TO GUARANTY AND ADMINISTRATION AGREEMENT
DATED JULY 10, 1987

"Vehicle Capitalization Formula

"\* \* \* \* \*

"Management Fee. The monthly management fee will be _____ of the vehicle capitalized cost.

"Depreciation. The monthly depreciation will be _____ of the vehicle capitalized cost.

"Interest. Mary Kay has the following interest rate options

"* * * * *

## "AMENDMENT TO
## GUARANTY AND ADMINISTRATION AGREEMENT
## DATED JANUARY 20, 1988

"The Agreement entered into as of the 10th day of July 1987, by Automotive Rentals, Inc. (hereinafter called 'Leasing Company') * * * and Mary Kay Cosmetics, Inc. (hereinafter called 'Lessee') * * * is hereby amended to include the following.

"* * * * *

"All other terms and conditions of the Guaranty and Administration Agreement dated July 10, 1987 shall remain unchanged. This Amendment shall become part of and attached to the Guaranty and Administration Agreement dated July 10, 1987."

## APPENDIX B
### EXCERPTS FROM STIPULATED EXHIBIT E—
### ARI LEASE AGREEMENT

"* * * * *

"2. DELIVERY & ACCEPTANCE OF VEHICLES. a. ARI agrees to deliver such vehicles to Lessee, subject to ARI's ability to obtain sufficient vehicles of the type ordered in the time specified by Lessee and subject to any other contingency beyond the control of ARI.

"* * * * *

"10. DISPOSITION AFTER SURRENDER OF LEASED VEHICLES a. ARI shall sell every vehicle leased hereunder after possession * * * shall have been surrendered by Lessee as provided in Article 8. Upon sale of a leased vehicle, ARI shall retain out of the sale price any costs which it may have incurred in transportation of the vehicle, fees paid, and repairs or replacements necessary to merchandise the vehicle, to arrive at the net resale proceeds for calculation of rental adjustments.

"b. ARI shall pay to Lessee, as a rental adjustment on automobiles, 100% of any excess of the net resale proceeds over the depreciated value of the vehicle. If the net resale proceeds are less than the depreciated value of the vehicle, Lessee shall pay to ARI as rental adjustment the amount of such deficiency, provided that ARI shall guarantee to Lessee minimum net resale proceeds equal to 20% of the Capitalized Value at the beginning of the initial lease term. If Lessee elects to extend beyond the minimum lease period, ARI shall guarantee 25% of the fair value of the vehicle at the inception of the concluding month's extension period. 'Fair Value' shall be defined as 85% of resale value for automobiles as reported by Automotive Market Report published by Automotive Auction Publishing, Inc., or its successor publications or publishers as of the publication date immediately preceding the last day of the month which immediately precedes the month in which termination as to the particular vehicle occurs.

"Settlements of excess of deficiency from resale, as described above, shall be based on calendar year-to-day sales. Tentative settlements will be made monthly, but adjusted quarterly to reflect year-to-date results. For this

purpose, a quarter is defined as a three month period ending March 31, June 30, September 30 and December 31.

"c.   As to automobiles a charge for excess milage at 2½ cents per excess mile, based on the following schedule shall apply, provided however, that same shall not exceed the aggregate amount of any guarantee required to be made up by ARI on resales during any full calendar year, as described in Article 10b.

"*   Any excess over 1,650 miles per month of usage during that first twenty-four months of service.

"PLUS

"*   Any excess over 850 miles per month of service thereafter. Such excess mileage charge shall be incorporated into the calculation of the 'Settlements of excess or deficiency from resale' provided for in Article 10b at the times therein provided for same to occur.

"d.   The depreciated value of each vehicle shall be the Capitalized Valued [*sic*] less the 'total depreciation reserve' paid by Lessee. The 'total depreciation reserve' shall be a sum derived by multiplying (1) the number of months a vehicle was in billed service and paid by Lessee, times (2) the Capitalized Value, times (3) the monthly depreciation percentage applicable to the initial lease term fixed for such vehicle."

## APPENDIX C
## EXCERPTS FROM STIPULATED EXHIBIT D—
## MARY KAY PROGRAM AGREEMENT

"1.  The Car Qualifier acknowledges, agrees to, and assumes all obligations of this Agreement and the ARI Lease Agreement.

"2.  The Car Qualifier acknowledges that the Career Car is delivered and accepted by Car Qualifier subject to all terms, rules, and conditions of the Mary Kay Career Car Program (hereinafter called 'Career Car Program') and the Mary Kay Automobile Insurance Program (hereinafter called 'Insurance Program'), both of which are attached hereto and incorporated herein. Specifically and without limitation, Car Qualifier understands that qualification for, possession of, and return of such Career Car are subject to Car Qualifier's maintenance of wholesale production in amounts specified in the Career Car Program and continued eligibility to participate in the Insurance Program. Mary Kay reserves the right to amend or alter, from time to time, such rules, terms and conditions of the Insurance Program and the Career Car Program, including but not limited to the amount of proportionate monthly co-op lease payments.

"* * * * *

"11.  The Car Qualifier agrees, as a condition to receiving the described automobile, to execute this Agreement and the ARI Lease Agreement. The Car Qualifier understands that any delay or refusal to execute these Agreements shall give Mary Kay the right to refuse participation of the Car Qualifier in the Career Car Program.

"* * * * *

"14.  Mary Kay hereby agrees to be responsible for any excess mileage charges as may be set forth in the ARI Lease Agreement between ARI and Car Qualifier."

## APPENDIX D
## EXCERPTS FROM DEFENDANT'S EXHIBIT M—
## MARY KAY.COM, COMPANY INFORMATION,
## RECOGNITION WEB PAGE
Submitted to the Court with Defendant's Motion for
Summary Judgment and Supporting Memorandum,
August 19, 2002

http://www.marykay.com/Home/Community/Headquarters/
Company/Recognition.asp

*"RECOGNITION*

"Mary Kay Inc. values and recognizes its independent sales force for growth and achievement, with incentives ranging from computer equipment and trips to its legendary car program.

"The Mary Kay fleet, one of the largest commercial fleets of General Motors passenger cars in the world, features 10,000 U.S. career cars valued at more than $150 million. Cars are earned by Independent Beauty Consultants and Sales Directors through outstanding sales and team building. The Cadillac has grown to symbolize ultimate success in Mary Kay since the first five were awarded as prizes for top performance in 1969. In addition to the Cadillac, the U.S. fleet includes the Grand Prix, the Grand Am and the Chevy Blazer. International car programs feature Mercedes, Toyotas and Fords."